[Civ. No. 990.    Third Appellate District.—December 31, 1912.]

## ALBION LUMBER COMPANY, Plaintiff, Respondent, v. A. J. LOWELL, Defendant, Appellant.

ACTION FOR BREACH OF CONTRACT TO SELL REDWOOD TIES—TIME NOT OF ESSENCE—REASONABLE TIME—FINDING—ACTION SUSTAINED.—In an action for the breach of a contract to sell redwood ties, where it appears that time was not made of the essence of the contract by its terms, the buyer was allowed a reasonable time in which to perform, and where the court found on sufficient evidence that the delay resulted from causes beyond the buyer's control, and was not unreasonable, the action is sustained.

ID.—STATUTE OF FRAUDS—SUFFICIENCY OF MEMORANDUM—SEPARATE WRITINGS—LETTER OF DEFENDANT.—Where the contract for the sale of the redwood ties required, under the statute of frauds, that a memorandum thereof shall be signed by each party, and although the original memorandum was signed only by an agent for the buyer, yet it is sufficient under the statute that the memorandum of each party be manifested by separate writings properly connected; and where the seller subsequently signed and addressed a letter to the buyer's agent, who signed the contract, in which he said, "Have you made any other arrangements about shipping the ties I sold you?" such letter constitutes a sufficient memorandum of the contract, as that of the seller, to satisfy the statute of frauds as to him.

ID.—DAMAGES FOR BREACH OF CONTRACT CLAIMED BY DEFENDANT—REMOTENESS.—The damages claimed by the seller were not proximate, within the definition of the Civil Code, nor such as in the ordinary course of things would be likely to happen, but were too remote.

ID.—CONTRACT IN SUIT PROPERLY ADMITTED—UNTENABLE OBJECTION—TIME OF DELIVERY—REASONABLE TIME IMPLIED.—The memorandum signed by the agent of the buyer was properly admitted in evidence. The objection that it specified no time for delivery is untenable, as a reasonable time would be implied.

ID.—EVIDENCE AS TO SINGLE CONTRACT FOR TIES.—It was not error to show by the buyer's agent that the plaintiff had no other contract with defendant than the one made November 5th, the purpose of the evidence being to show that defendant's letter of November 20th had reference to the transaction of November 5th. It would have been in aid of fraud, rather than its discouragement, to have excluded such evidence.

ID.—FAILURE TO DELIVER TIES AGREED—PRICE IN OPEN MARKET.—Upon showing the failure of the defendant to deliver the ties agreed, it was proper for the plaintiff to give testimony that it was compelled to go into the open market to supply the same, and the testimony of witnesses as to the market price at the times mentioned was admissible.

ID.—CROSS-EXAMINATION OF PLAINTIFF'S AGENT—PURPOSE OF DEFENDANT IN SALE OF TIES—PROTECTION OF OPTION TO PURCHASE LAND.—It is held by the appellate court: "We do not think it was material and hence not error to sustain objections to questions put on cross-examination to McDonald, (the plaintiff's agent), for the purpose of showing that Lowell (the defendant), was selling the ties to protect himself upon the Gray option. Lowell's relations with Gray did not concern the plaintiff, and defendant's motive in selling the ties was not material. Conversations at the time of making the contract would not be admissible to vary its terms."

ID.—COMMENT BY SUPREME COURT ON ORDER DENYING REHEARING.—
The supreme court, in its order denying a rehearing, questions the
foregoing ruling, and adds that it "does not contain a correct
answer to the claims of error referred to therein, and that the court
erred in its rulings upon this matter, but that on recross-examination
McDonald testified fully upon the matters which were sought to
be elicited by the questions on cross-examination referred to."

ID.—CROSS-EXAMINATION OF DEFENDANT—TIES REFERRED TO IN LET-
TER.—It was proper to show on cross-examination of the defendant
that the ties referred to in his letter of November 5th "were the
ties he agreed to buy from me." Such evidence is not objectionable
as varying the terms of a contract.

APPEAL from a judgment of the Superior Court of Mendo-
cino County and from an order refusing a new trial. J. Q.
White, Judge.

The facts are stated in the opinion of the court.

Robert Duncan, and J. C. Ruddock, for Appellant.

Mannon & Mannon, for Respondent.

CHIPMAN, P. J.—Plaintiff brings the action to recover
for the breach of an alleged contract entered into between
plaintiff and defendant, November 5, 1908, for the sale and
purchase of redwood ties. It is alleged that, about March
1, 1909, plaintiff notified defendant of its readiness to receive
the ties but defendant repudiated and refused to carry out
said contract. Defendant denies that he entered into any
contract with the plaintiff, as alleged or at all. As further
answer: that the agreement sued upon is for goods and chat-
tels of value exceeding two hundred dollars and is in violation
of the statute of frauds, not having been in writing sub-
scribed by defendant. As a third answer, defendant alleges
that he "entered into certain negotiations with one Donald
McDonald in reference to said redwood ties . . . and said
McDonald thereupon wrote in his own handwriting" the fol-
lowing instrument:

"Nov. 5, 08.

"Bot. of A. J. Lowell for the Albion Lumber Co. 35M to
40M 6x8x8 split redwood ties at 34c each f o b vessel West-
port subject to our inspection when loaded on vessel. Pay-
ments to be made in cash to Geo. D. Gray 110 Mkt. St. San
Francisco as fast as these ties are moved. Donald McDon-

ald''; that this is the alleged agreement sued upon; that no part of said ties was received or accepted by said McDonald or said plaintiff nor has any part of the purchase price been paid therefor; that as part of said agreement on the part of the buyer and as part of the consideration it was agreed that the buyer ''should begin moving and accepting said ties within ten days or two weeks from said November 5th, 1908, at the latest'' and so continue until all were accepted and moved by the buyer and were to be paid for as fast as accepted and moved; that said time of acceptance was ''expressly made part of said consideration of purchase and was a material part of said consideration'' and ''was expressly made the essence of the contract of purchase''; that, through the fault of plaintiff, ''said ties were not taken nor accepted nor paid for within said time nor within a reasonable time thereafter''; that, thereupon, defendant promptly notified plaintiff ''that the said defendant refused to sell or deliver the said ties or any part thereof; that any contract, verbal or otherwise, claimed or alleged by said McDonald or plaintiff to have been entered into with reference thereto by the defendant, was rescinded by said defendant.''    For a fourth separate answer, among other things, it is alleged that ''at the time of the agreement on the part of the buyer, said defendant informed said McDonald that it was necessary that said ties should be accepted and defendant have the money for said ties in the immediate future in order that said defendant might pay one Geo. D. Gray for certain timber lands'' for the purchase of which defendant had a contract from Gray, ''and said McDonald then and there agreed that said ties would be taken and paid for in the immediate future,'' payments to be made to Gray, to which he consented; that plaintiff did not offer to take said ties or pay for them until about March 1, 1909, and said delay was unreasonable ''and defendant thereupon refused to deliver said ties''; that, prior to said offer to take said ties, said Gray had notified defendant that ''he would no longer deal with plaintiff and would cancel said option or contract of sale to this defendant unless said defendant should make some other arrangement for the sale of said ties and payment to said Geo. D. Gray'' and that, ''by reason thereof and said unreasonable delay on the part of plaintiff and said McDonald, . . . defendant

refused to sell or deliver said ties," and so notified plaintiff. Defendant pleaded a set-off or counterclaim, alleging that, by reason of plaintiff's failure to accept and pay for the ties he "was compelled to and did make two trips from his place of business at Westport to the city of San Francisco" and expended for his necessary expenses on said trips one hundred dollars and "lost twenty-four days from his other business" and was thereby damaged in the sum of two hundred and forty dollars; and that, by reason of plaintiff's said failure, "defendant was compelled to and did pay to said Geo. D. Gray the sum of five hundred dollars for an extension of the said option . . . until this defendant could secure the necessary money to pay the said Geo. D. Gray therefor." A general demurrer to this defense was sustained "and motion to strike out matter from said counterclaim granted." Plaintiff's answer to defendant's separate defenses is a denial of the averments.

The court made the following findings: That plaintiff and defendant entered into a contract, on November 5, 1908, by which "defendant agreed to sell to the plaintiff and the plaintiff agreed to buy from defendant 35,000 split redwood ties" upon the terms stated in the agreement set out in defendant's answer, and, on said date, McDonald, "who was the general manager and duly authorized agent of the plaintiff corporation, having authority so to do, wrote, signed and delivered to defendant an instrument in writing" (the same as set out in the answer); that, "thereafter the defendant duly ratified, acknowledged and accepted the terms of said contract by several instruments in writing subscribed by him in his own name"; that "the said written instrument contains all the terms of the contract between the plaintiff and defendant." It is further found that, after said memorandum was signed by McDonald and delivered to and accepted by defendant, "further conversation was had between the defendant and the agent of plaintiff as to when plaintiff would receive said ties; but plaintiff did not agree that it would begin moving said ties within ten days or two weeks from said November 5, 1908, or at any specified date; that no time of acceptance was made part of the consideration of said contract nor was the time of acceptance and payment particularly or expressly or at all made the essence of the

contract of purchase and sale"; that, about March 1, 1909, plaintiff notified defendant·of its readiness to receive said ties but defendant thereupon notified plaintiff that "he would not carry out said contract and would not deliver said railroad ties or any part thereof and then repudiated said contract. That plaintiff was then ready to receive and pay for all said ties in accordance with the terms of the contract hereinbefore set out. That plaintiff offered within a reasonable time to accept and pay for said railroad ties and the consideration for said contract moving to defendant herein did not fail in any respect whatever and that said contract was never rescinded; that plaintiff never offered to take or pay for said ties until about the 1st day of March, 1909, but that said delay was not unreasonable." It was further found that the price of ties "advanced in value to 40 cents each on board vessel at Westport," after said contract was entered into, and were of that value on March 1, 1909, and for thirty days prior thereto; that, relying on said instrument, plaintiff contracted to sell the ties therein mentioned to a third party "and by reason of defendant's refusal to deliver said ties, plaintiff was compelled to purchase, and did purchase, 35,000 ties of the same quality, in the open market, and was compelled to pay therefor at the rate of 40 cents each," and was thereby damaged in the sum of two thousand one hundred dollars. Judgment for that amount was entered in favor of plaintiff. The appeal is from this judgment and from the order denying defendant's motion for a new trial.

The pleadings and findings of fact present a fairly clear exposition of the various contentions of the parties.

Aside from some alleged errors of law assigned by defendant in the course of the trial, the principal if not the only point presented by defendant is: That there was no contract or memorandum in writing signed by defendant and therefore the agreement was invalid.

There was evidence that, on November 5, 1908, Lowell met McDonald, whose agency and authority to act for plaintiff in the matter is admitted, for the purpose of selling the ties in question then on the landing at Westport, Mendocino County; that the meeting resulted in McDonald's agreeing to purchase and Lowell agreeing to sell on the terms set forth in the written memorandum signed by McDonald on behalf

of plaintiff, as set forth in defendant's answer; that McDonald gave the original to Lowell, retaining a copy. Present at this meeting was W. P. McFaul, who had a day or two before informed McDonald that Lowell had some ties and who arranged with McDonald to meet Lowell. McFaul's interest in the sale arose out of the fact that he had an option to purchase certain timber land from George D. Gray, mentioned in said memorandum. Lowell had advanced money to McFaul in carrying on his tie-cutting and lumber operations; the Gray option had expired and McFaul desired Lowell to take up the matter with Gray for a renewal of the option. Lowell testified: "It was understood between me and Mr. McFaul to sell these ties and apply it on the option and take it over myself. I had advanced some money to McFaul and had money tied up in this land." McFaul testified: "I am interested in this transaction. My interest is this: Our option (his firm was McFaul and Hess) had expired on the land, Mr. Gray had notified us that we would have to vacate, so our interest was to have Mr. Lowell take up this option, extend the option to us and give us a chance to get our equity out of the property which he had agreed to do if he could make arrangements to pay off Mr. Gray. At that time our company was indebted to Mr. Lowell something in the neighborhood of $7,000.00." McDonald testified, in speaking of what occurred, that he "did not know at that time whether Mr. McFaul was interested in the ties, or what the situation was. There was nothing said as to what Mr. McFaul's interest in the transaction was. He appeared anxious to have the ties sold, that was all." McDonald testified further that after the terms of the sale had been agreed upon and the memorandum was signed and given to Lowell they had a further conversation as to how soon McDonald could send for the ties. He testified: "My recollection is after we had agreed on the terms of purchase and all that concerned that in their inspection and one thing and another, Mr. Lowell asked me how soon can you have a vessel up there to move them? Well, I said, the 'Pasadena' (the vessel which it was understood was to bring out the ties) has got a cargo or two at Albion (a nearby port), and she has got two cargoes from Newport (another neighboring port), and of course the weather conditions get bad and I can't state defi-

nitely, but I will do it as soon as I can possibly get a boat up there. Just as soon as I could get the 'Pasadena' up there, that is my reports I got from her, I could get them moved. As it is I had other business ahead of that I had to attend to. There was very little conversation between Lowell and myself on the subject. I assured him I would do it as soon as I could, which was my intention to do all the time. No definite time was mentioned by either of us, I could not give a definite time at that time of year or any other time of year. I could only do it as I got to it. Q. Was anything said at that time about moving them within ten days or two weeks? A. I would not agree to handle any as soon as that. Q. Was anything said about that? A. I know nothing was said to me about it, if there had been I would simply have said, 'I can't do it in ten days or two weeks.' The only statement on my part was that I would do it as soon as I possibly could. We expected to shortly begin work with them, move them away." He testified that this was the only transaction for cross-ties he or his company had with Lowell. Later in the day the same parties met with Mr. Gray. Lowell's object in bringing about the meeting was to satisfy Mr. Gray in order that the McFaul option might be extended. Plaintiff had no interest in this matter, as Lowell had the ties and had the right to sell them and had already sold them. Gray testified that Lowell made the appointment for the meeting and brought him there; that the object was to satisfy him that he would "receive the cash due for the sale of the ties immediately on delivery of the ties that were receipted by the inspection certificate, and furthermore, that a vessel would proceed immediately to bring those ties into the market as I had insisted upon cash from Mr. Lowell." Gray also testified that McDonald said "he could not send a vessel immediately, of course, as the vessel was at the time on the Mendocino coast"; that she had some trips to make; that "as to the moving of the ties he assured me the vessel would go for them within ten days or two weeks." He further testified: "I don't remember that the transaction between Lowell and McDonald was discussed at that time. I saw no paper pass between them." There was much testimony tending to show that the condition of the weather was such, after the "Pasadena" was at liberty to go for these ties, as to make landing

at Westport uncertain and at times dangerous if not impracticable, during the months of December, January and February; there was also evidence that in one of her trips she became disabled and was sent to dry dock for repairs which consumed about two weeks; that plaintiff had made unsuccessful efforts to reach Westport landing and that McDonald, acting for plaintiff, had resold the ties and was anxious to get them out and make delivery. Upon these various phases of the transaction, including the delay on plaintiff's part and its cause, there is a conflict in the evidence, but we think there was sufficient to justify the trial court in making its findings upon them.

Time was not made of the essence of the contract by its terms and McDonald testified that he made no promise to move the ties at any specified time. Hence plaintiff was allowed a reasonable time to perform. The court found, on sufficient evidence, that the delay resulted from causes beyond plaintiff's control and was not unreasonable. (*Salinas Lumber Co.* v. *Magne-Silica Co.,* 159 Cal. 182, [112 Pac. 1089].) Nevertheless, it is urgently contended that defendant is not liable because, as is claimed, he never, in writing, agreed to the sale. And this brings us to an examination of what further followed the signing of the memorandum by McDonald.

There is a conflict in the evidence as to what he did with the memorandum after signing it. He testified that he gave it to Lowell, retaining a copy. Lowell testified that McDonald handed it to McFaul, who afterward, he did not remember when, gave it to him. This was the memorandum produced at the trial by defendant. It is perhaps not important which received it, for McFaul was there in Lowell's interest and in a sense acting for him or at least jointly with him in bringing about the sale though not a party to the sale. However, the court accepted McDonald's version and so must we. The parties separated with the understanding that the memorandum expressed the terms of the sale. On the twentieth day of November, 1908, fifteen days after the memorandum was in Lowell's hands, he wrote McDonald a letter in which, among other things, he said: "Have you made any further arrangement in regard to shipping the ties I sold you? My object is that I had ordered some freight from San Francisco and referred shippers to the Bishop Lum-

ber Co. for a vessel to Westport; their answer being that
they had no vessel for Westport, this being the case I thought
perhaps you had instructed them as to when you would take
the ties out.'' It may be observed that this was after the
limit of time for delivery had been reached, according to
Lowell's testimony, and yet he makes no mention of it nor
complains of the delay. Upon the point under consideration
we are satisfied that Lowell, in his letter of November 20th,
referred to the memorandum signed by McDonald and could
have referred to none other for the reason that this was the
only sale of ties made by Lowell to plaintiff or to McDonald.
He so testified on his cross-examination. On November 30,
1908, McDonald replied: ''. . . I am in receipt of yours of
the 20th. In regard to your ties: I have a couple of cargoes
to move from Newport, after which I will have the 'Pasadena'
move those that I bought from you at Westport, but as those
ties are all going to San Pedro, the 'Pasadena' will not call
at San Francisco. She will come up from San Pedro direct
to Westport. How much freight will you have? If the
amount is sufficient to warrant it I could have the boat call
into San Francisco. It costs one hundred and twenty-five
dollars per day to run one of these boats, and you will un-
derstand that the loss of time is quite a serious thing.''
Lowell made no reply to this letter. It was now the end of
November and no complaint had been made of any delay on
plaintiff's part. About the first of February McDonald met
Gray and explained to him the causes of the delay in not
moving the ties. He testified: ''He (Gray) said of course
those things you cannot help, the only things we have to guard
against in transporting lumber and ties on the Mendocino
coast, or words to that effect, he realized those things. After
this conversation, I think about the middle of February, I or-
dered the captain to Albion (near Westport) for orders with
a view of sending him to Westport if there was a chance to
get the boat in there; he came to Albion; it was very rough.
I told him to go up the coast now, we had to move those
ties. . . . He laid out three or four days and came back to
San Francisco without a cargo. It was then I called up Mr.
Lowell (by telephone) and told him I expected to get the
'Pasadena' up there. My recollection is I talked to him
twice, once about the middle of February, and when I advised

him I would be up there for a cargo he told me then he didn't think the deal would go through, that he had heard something from Mr. Gray and would have to see Mr. Gray first before he could say whether he would deliver me the ties or not. . . . My recollection I called a few days after that, about February 25th, he was at home. He said he had been to San Francisco and had seen Mr. Gray, the whole thing was off, could not have the ties under any conditions. I have no recollection of Mr. Lowell calling me by telephone or writing any letter, or making any other demand to take those ties than what is shown by the letters introduced in evidence.'' In one of these telephone conversations between McDonald and Lowell, the former offered to advance the latter seventy-five per cent on the ties at the landing, but Lowell said that would not help him, as Gray wanted all his money. It appears from Lowell's testimony that he went to San Francisco in February. He did not see or communicate with McDonald but did see Gray, who told him he would have nothing more to do with McDonald, whereupon Lowell sold the ties to the Santa Fe Railroad Company for what would have yielded him forty cents per tie if he had not been obliged to pay Gray a commission on the sale. On March 3, 1909, McDonald wrote Lowell, notifying him that plaintiff would expect him to make delivery of the ties which he had sold the Albion Lumber Company on November 5, 1908. Lowell answered March 8, 1909, ''replying to your letter under date of March 3rd, 1909, relating to the 35,000 to 40,000 split redwood ties your Mr. McDonald agreed to purchase from me on November 5th, '08.'' He then proceeds to state that ''this sale was made to cover a certain option which I held from Mr. Gray on timber lands'' and to restate what he claimed was the agreement about delivery and that he had been damaged by the company's failure to keep its agreement, concluding that he would hold it responsible to him for the damage. Some point is made by counsel for defendant in connection with these two letters—that McDonald introduced a new condition to his readiness to pay for the ties, to wit: ''less a proper amount for chuteage and inspection,'' as to which there was no meeting of minds. We attach no particular importance to either of these letters; they were written after Lowell had repudiated the contract originally

entered into; both were claiming damages and both dealing with a situation which arose after the contract had been repudiated by defendant and his liability, whatever it became, was fixed. The question to be decided is—Did Lowell's letter of November 20, 1908, under the circumstances, amount in legal contemplation, to a memorandum in writing sufficient to charge him? We entertain no doubt that it had such effect and that plaintiff had the right to so regard it. Defendant contends that, under the statute of frauds, Lowell could not be charged except upon a memorandum signed by him containing "every material part of the contract of sale"; and "it must show the names of the parties, the subject matter of the sale, and the terms and conditions of sale and must be certain as to all these." (Citing *Breckinridge* v. *Crocker*, 78 Cal. 529, [21 Pac. 179], Brown on Statute of Frauds, 5th ed., sec. 384, and other authorities.) It is further claimed that "if it is sought to establish a memorandum of contract by different papers the papers must be attached together, or one must clearly refer to another, and they cannot be connected by parol testimony." (Citing Tiedeman on Sales, sec. 75.)

Turning to the memorandum signed by McDonald, it will be found to lack nothing to charge plaintiff. The mere delivery of the memorandum to Lowell would not bind Lowell, but it is not the law that before he would be bound he must himself write and sign a memorandum equally specific. Any communication in writing by Lowell to plaintiff sufficiently definite to show his acceptance of or acquiescence in the memorandum of purchase signed by plaintiff or showing that he treated it as an existing obligation of plaintiff and binding on himself would satisfy the statute. There is nothing in the statute of frauds requiring the signed memorandum of a contract to be contained in a single paper. Two or more papers properly connected may constitute a sufficient memorandum. (20 Cyc. 278; *Brewer* v. *Horst & Lachmund Co.*, 127 Cal. 643, [50 L. R. A. 240, 60 Pac. 418].) The evidence very clearly shows that the contract was treated as valid and binding by both parties until the latter part of February, 1909, four months after its execution, and it was then disavowed by defendant not because it was never entered into but because of plaintiff's alleged failure to promptly move the ties.

It remains to notice certain alleged errors of law.

The rule stated by the code is that for a breach of contract the measure of damages is "the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." (Civ. Code, sec. 3300.) To be proximate the damages must be such as "next immediately follow and are produced by the act complained of," or if not proximate, "such as in the ordinary course of things would be likely to result therefrom." (*Friend & Terry L. Co.* v. *Miller,* 67 Cal. 464, [8 Pac. 40].) The damages claimed (by defendant) could not well have been contemplated by the parties when they entered into the contract. They were not proximate as proximate damages are above defined and we do not think they were such as would be likely to result in the ordinary course of things. They were too remote. (See *Martin* v. *Deetz,* 102 Cal. 55, [41 Am. St. Rep. 151, 36 Pac. 368] ; *Wallace* v. *Ah Sam,* 71 Cal. 197, 60 Am. Rep. 534, 12 Pac., 46].)

We think the McDonald memorandum of November 5, 1908, was properly admitted in evidence. The objection that it specified no time of delivery is not tenable, for a reasonable time would be implied. (Civ. Code, sec. 1657.)

It was not error to show by witness McDonald that plaintiff made no other contract for ties with Lowell. The purpose of the evidence doubtless was to show that Lowell's letter of November 20th had reference to the memorandum of November 5th by showing that the parties had no other transaction. We think it would have been in aid of fraud rather than for its discouragement, to allow defendant to claim that he referred to some other transaction by having the evidence excluded.

The letters dated respectively November 20th and 30th were admissible. McDonald's letter of March 3 and defendant's of March 8, 1909, perhaps added nothing material to the case, but they were not prejudicial to defendant.

The plaintiff's testimony that, upon defendant's refusal to deliver the ties, it was compelled to go into the open market to supply them and the testimony of witnesses to the market price of ties at the times mentioned was admissible.

We do not think it was material and hence not error to sustain objections to questions, put on cross-examination to

McDonald, for the purpose of showing that Lowell was selling the ties to protect himself upon the Gray option. Lowell's relations with Gray did not concern plaintiff and defendant's motive in selling the ties was not material. Conversations at the time of making the contract would not be admissible to vary its terms.

Some questions put and answers given and some rulings occurring in proving market value may be open to objection, but in the main the questions were proper and no prejudicial error is discoverable. The motion for nonsuit was rightly denied.

In his cross-examination Lowell was asked what ties he referred to in his letter of November 5th and, over objection, answered: "I referred to the ties he agreed to buy from me." The objection is that parol evidence is inadmissible to prove the terms of a contract under the statute of frauds. The question did not tend to vary the contract or introduce any new condition. In fact, we think the letter was sufficiently definite on its face. If there was doubt as to his meaning the enforcement of the rule against parol evidence would aid rather than discourage fraud. (*Beckwith* v. *Talbot,* 95 U. S. 289, [24 L. Ed. 496].)

It is contended that the evidence is insufficient to justify the finding that defendant "fully ratified, acknowledged and accepted the terms of said contract (the memorandum) by several instruments in writing subscribed by said defendant." The finding is supported if there was one such instrument and we think defendant's letter of November 5th was sufficient. We very much doubt the right of plaintiff to have made proof of custom or usage in the matter of shipping ties and lumber from along the Mendocino coast as excusing delays in delivery in the manner it was attempted to be done. One witness in his answer simply gives his own experience as a shipper on one occasion, which did not tend to establish usage. The only other witness answered: "Well, the custom is a man undertakes to transfer lumber on the Mendocino coast is for his ability to do so, weather conditions, accidents and other things particularly controlling, that is the custom among all freighters on the coast." The answer is meaningless and could not have been prejudicial.

We have thus endeavored to notice the questions presented by defendant's brief and, discovering no prejudicial error in the transcript, the judgment and order are affirmed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 1, 1913, and the following opinion then rendered thereon:

THE COURT.—In denying a hearing in this court after decision by the district court of appeal of the third district, we deem it proper to say that the following paragraph, viz.:

"We do not think it was material and hence not error to sustain objections to questions, put on cross-examination to McDonald, for the purpose of showing that Lowell was selling the ties to protect himself upon the Gray option. Lowell's relations with Gray did not concern plaintiff and defendant's motive in selling the ties was not material. Conversations at the time of making the contract would not be admissible to vary its terms," does not contain a correct answer to the claims of error referred to therein. This matter is not urged in the petition for a hearing in this court. We think the lower court erred in its rulings in this matter, but it appears from the record that on recross-examination McDonald testified fully upon the matters which were sought to be elicited by the questions on cross-examination referred to.

BEATTY, C. J.—Dissenting.—I cannot concur in the view of the court that the testimony of McDonald on recross-examination cured the error of the trial judge in sustaining the objection to the questions previously asked for the purpose of showing that in the course of the negotiation for the sale of the ties he was informed by Lowell that the sale was being made at a sacrifice for the sole purpose of raising funds essential to the securing of a valuable option. This ruling was sustained by the appellate court on the ground that "Lowell's relations with Gray did not concern plaintiff and that defendant's motive in selling the ties was not material." It is here conceded that McDonald's knowledge that Lowell was selling the ties at thirty-four cents cash on delivery in order

to secure funds to meet a pressing obligation to Gray was competent and material evidence on the question of reasonable time for removing the ties—the controlling question in the case. If so, McDonald's admission subsequently made that he did know that Lowell was making the sale in order to pay Gray a debt of some sort—only denying knowledge that it was to *secure an option*—can hardly be supposed to have caused the trial judge by whom the findings were made, to change his opinion that such testimony could not be considered as having any relevancy to the question of reasonable time.

I think the long delay in sending for the ties, while the defendant was kept waiting for his money, was altogether unreasonable.