**BOWLES, Adm'r, Office of Price Administration, v. JUNG et al.**

**Civil Action No. 3475.**

District Court, S. D. California,
Central Division.

Nov. 21, 1944.

Wm. U. Handy and Arline Martin, Office of Price Administration, both of Los Angeles, Cal., for plaintiff.

Louis Lerner, of Los Angeles, Cal., for defendants.

YANKWICH, District Judge.

The action was instituted on February 25, 1944, by Chester Bowles, the Administrator of the Office of Price Administration, against Jim Jung, individually, and doing business as Victory Produce Company. It charges violation by the defendant of Maximum Price Regulation 292, as amended (8 Federal Register 135). The complaint avers total excess charges of $1414.17, and seeks to recover $4242.51, being three times the aggregate amount by which the price received by the defendant from the sale of 1581 lugs of tangerines is alleged to have exceeded the maximum prices provided in the regulation.

The defendant is a produce merchant engaged in selling, as a wholesaler and, what the regulation calls, "an intermediate seller," selling to other intermediate sellers and retailers. Although he engaged in the selling of all kinds of produce, the transaction involved was his sole venture into the field of tangerines, and covered only the short period between November 26 and December 6, 1943. The individual sales were made from two bulk purchases made by the defendant. In view of the discussion to follow, we reproduce in full, in the margin, the definitions which the regulation gives to certain terms, and the formulæ which it establishes for determining prices.[1]

It was the contention of the Administrator in the pre-trial brief that one of the purchases was made by the defendant as an intermediate seller, and the other as a commission merchant on consignment. At the trial, the Administrator modified his position as to the first purchase by endeavoring to show that the purchase was a *direct* purchase by the defendant from a grower, through an agent.

The first of these transactions may be designated as the George Ko transaction involving 481 lugs of tangerines. The de-

[1] "1351.1404. Definition of a maximum price for packers, brokers, auction markets, terminal markets, terminal sellers and commission merchants. (a) For the purpose of this regulation:

"(5) A 'commission merchant' is a person who receives citrus fruits on consignment from a packer or any other seller and who performs the customary wholesale functions of unloading cars, warehousing, and selling through such warehouse in less than carlots.

"(b) The maximum price for direct sales of citrus fruits sold by a packer, f.o.b. packing house, shall be as set forth in this section and in paragraph 1351.1416, Appendix A, of this regulation.

"(c) The maximum price for direct sales of citrus fruits by a packer, on a delivered basis, shall be the packer's maximum price, f.o.b. packing house, plus freight to the point of delivery.

"(f) The maximum price for sales of citrus fruits through a commission merchant shall be the packer's maximum price for direct sales, delivered at the commission merchant's customary receiving point, plus the usual charges, commissions or fees of the commission merchant, computed on the basis of such delivered maximum price."

"Section 1351.1405. Definition and maximum prices of intermediate sellers.

"(a) For the purposes of this regulation, the term 'intermediate sellers' means any wholesale sellers, jobbers, or any other persons who take title and purchase for the purpose of reselling and who customarily make sales to other wholesalers, retailers, or industrial, institutional or commercial users, except that the term 'intermediate sellers' shall not include packers, commission merchants, brokers, auction markets, terminal sellers or retailers as defined in this regulation.

"(b) Intermediate sellers shall be divided into the following classes:

"(1) Class 1: Retailer-owned cooperative wholesaler. A retailer-owned cooperative wholesaler is either a nonprofit organization or a corporation of which 51% or more of the stock is owned by its retailer customers and which distributes citrus fruits for resale.

"(2) Class 2: Cash-and-carry wholesalers. A cash-and-carry wholesaler is a wholesaler not in Class 1 who distributes citrus fruits for resale or to commercial, industrial or institutional users and who does not customarily deliver to purchasers.

"(3) Class 3: Service wholesalers. A service wholesaler is a wholesaler not in Class 1 who distributes citrus fruits for resale or to commercial, industrial or institutional users and who customarily delivers to purchasers.

"(c) The 'base price' of any intermediate seller who purchases from a packer or broker, shall be the 'base price' furnished to him by his supplier. The 'base price' of any intermediate seller who purchases from an auction market, commission merchant, or terminal seller shall be the 'base price' of his supplier, except that if his supplier is not within local hauling distance of his customary receiving point, the intermediate seller shall compute a new 'base price' by adding to that 'base price' the freight to his customary receiving point. If he resells to another intermediate seller, he shall give such purchaser notice in writing of his 'base price,' which shall be the 'base price' reported to him by his supplier or his newly computed 'base price', as the case may be.

"(d) The 'base price' of any intermediate seller who purchases from an intermediate seller shall be the same 'base price' reported to him by his supplier. In the event that he resells to another intermediate seller he shall give such purchaser notice in writing of such 'base price.' "

fendant's resale price on this shipment was $2.90 per lug on cash-and-carry sales and $3.20 on delivered sales. The Administrator contends that these charges were erroneous, that the ceiling price on cash-and-carry sales was $1.65 per lug and $1.82 on delivered sales. The Administrator's computation is arrived at as follows:

30 pounds net at .045 lb. = $1.35 Packer's f.o.b. ceiling price at point of shipment, Bakersfield area, California.

Freight to Los Angeles via Pacific Produce Co. trucks based on actual freight paid. .1545

$1.5045 Packer's delivered ceiling price to Los Angeles

Victory Produce Co. Intermediate Seller ceiling prices

$1.5045 at 1.095 = $1.65 Wholesaler cash-and-carry ceiling price

1.5045 at 1.21 = $1.82 Service wholesaler ceiling price.

The facts relating to this transaction, as testified to by the manager of the defendant, were these:

Ko was a Chinese who represented to the defendant that he might supply him with produce originating in Bakersfield, Kern County, California. The defendant agreed to secure for him an agent's license under the laws of California, California Agricultural Code, Sec. 1263(b), St.1939, p. 2327, and to repay him the amounts expended in purchasing produce and, in addition, pay him a commission. Some tomatoes were shipped under this agreement.

However, before the tangerine deal got under way, this arrangement was abandoned and the defendant, through his general manager, agreed with Ko that Ko should buy produce *for his own account* and resell it to the defendant, drawing against them, *in his own name,* for the amount of the purchase. While the oral testimony given in the courtroom by Ko, called as a witness by the Administrator on rebuttal, is somewhat at variance with the summary I have just given, I believe that, on the whole, the testimony offered by the defendants, corroborated by the written evidence in the case, shows unequivocally that the transaction was carried out in substantially the manner in which the manager testified.

Ko was given a book containing unfilled drafts. He was authorized to fill out a draft for each purchase, giving in detail the article, the purchase price, both unit sale and total, and to draw the draft for the total amount. The original of the draft was sent to defendant's bank at Los Angeles, a copy was sent to the defendant's office, and a third copy was retained in the book. Upon receipt of the draft, the bank notified the defendant, who then issued a check to cover the amount, and the bank, thereupon, honored the draft.

The testimony of Ko, given orally in court, confirms the conclusion that he bought the tangerines for his own account and resold them, *as an accommodation,* to the defendant. He testified that the grower from whom he bought the tangerines (Gus Crane) charged his account with their price, that he had had other transactions with him, and that he settled with him from time to time. When he received the money from the drafts, he did not turn it over to Crane. He deposited it to his own account in his own bank. From this account he paid the growers with whom he dealt, including Crane. Had Ko disposed of the tangerines to others, or had he failed to pay the grower, the latter could not have sued the defendant. And Crane, even if he knew of the existence of the Victory Produce Company, and that the tangerines were being shipped to them, could not have recovered from them the price Ko had agreed to pay him.

Ko testified that he was to receive a commission of five cents per lug, in addition to the price he actually paid. There is no evidence in the record that he ever

did receive it. The books of the company, the inspection of which was available to the Administrator, fail to disclose any payment to Ko other than the payment of the drafts for the actual amount of the purchase price.

The defendant's file in the case of each purchase, contained a copy of the draft, a copy of the check, and a credit memorandum prepared by the defendant showing the transaction in detail.

In view of the discussion to follow, we set forth in the margin the form of one of these drafts:

In making the resale, the defendant took the price he paid to Ko and added to it the 9½ per cent mark up allowed by the regulation on cash and carry sales and 20 per cent on delivery sales.

The Administrator challenges the resale prices on two grounds.

■ He contends that the defendant cannot take as his base price the price he paid to Ko, *unless Ko computed the price at which he was selling according to the regulation.* I do not think that the regulation, read as a whole, supports this contention.

Section 1355.1405(c) of the regulation is to the effect that the base price of the intermediate seller shall be the base price *"furnished* to him by his supplier." (Italics added)

■ Subdivision (d) of the same section fixes the base price of an intermediate seller who purchases from another intermediate seller as "the same 'base price' *reported* to him by his supplier." (Italics added) Words in a regulation must be given their ordinary meaning. Of course, in interpreting a regulation made under a statute of this character, Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix § 901 et seq., we must bear in mind the "necessities of the public interest which Congress has sought to protect." Hecht Co. v. Bowles, 1944, 321 U.S. 321, 330, 64 S.Ct. 587, 592, and United States v. Morgan, 1939, 307 U.S. 183, 194, 59 S.Ct. 795, 83 L.Ed. 1211.

To "furnish" means to supply, to give. To "report" means to give an account of, to relate, to tell.

■ It is the contention of the Administrator that these drafts did not comply with the requirement of Section 1355.1405, because they did not take the form of the ordinary commercial invoice. I cannot agree. The Office of Price Administration could have provided a specific form for the "furnishing" or "reporting" of a price. They did not do so. Consequently, we must assume that any method which one merchant uses to indicate to another the price at which he sells a commodity is sufficient.

■ The sample draft, here reproduced, constituted a memorandum sufficient to satisfy the California Statute of Frauds. For it contained the names of the parties, the price, the quantities, the place of delivery and the signature of the seller. See: California Code of Civil Procedure, Sections 1973, 1973a; Brewer v. Horst & Lachmund Co., 1900, 127 Cal. 643, 60 P. 418, 50 L.R.A. 240; Albion Lumber Co. v. Lowell, 1912, 20 Cal.App. 782, 793, 130 P. 858, 864. This accords with the law elsewhere. See 37 C.J.S., Frauds, Statute of, §§ 191–196, 199c(3, 4).

And it certainly cannot be argued that the Office of Price Administration, having failed to provide *for a particular form of, notification,* can insist that one which would be a binding contract under the law of California is insufficient for the purposes of this regulation.

Nor can I follow the Administrator in his contention that before the defendant could pay the price asked by Ko, it was imperative that Ko shall have computed correctly the base price at which he was selling. The regulation, and especially the clauses of the section referred to, (see (c) and (d)) do not place such responsibility upon an intermediate seller. They permit him to ground his price upon the price *furnished* or *reported* to him by the seller. *They do not make it his duty to ascertain* whether the seller had computed the price correctly, under penalty of having his resale price challenged. It may well be, as counsel for the Administrator stated, that "base price" in this regulation are words of art and must be interpreted in the light of the aim to be achieved by the regulation. But this does not require us to place a responsibility upon one vicariously where the regulation does not impose it.

■ It is also true that, in an action of this character, inquiry might be made to see if a purchase was a mere subterfuge to avoid the regulation. Here the evidence is uncontroverted that the purchase from Ko was made at the price shown on the face of the drafts.

■ I am, therefore, of the view that the defendant, in making the resales, had the right to start with the price he had paid, adding to it the mark-ups allowed by the regulation.

■ The Administrator challenges the mark-ups in this and the other transaction, upon the ground that the defendant charged for deliveries which were made within a short distance, not exceeding, at the most, several blocks within the same area. The Administrator urges that his office has interpreted "delivery" not to in-

clude deliveries within the same market. But the regulation does not define "delivery." Therefore, the word must be given its ordinary legal sense. Under the law of sales, title to the goods passes at once to the buyer if an agreement is executed. See: McKinney v. Sargent, 1932, 216 Cal. 18, 13 P.2d 373; Hatch v. Standard Oil Co., 1879, 100 U.S. 124, 25 L.Ed. 554; Louisville & N. R. Co. v. United States, 1924, 267 U.S. 395, 45 S.Ct. 233, 69 L.Ed. 678.

■ If the seller is required to deliver the goods at a place designated by the buyer, title does not pass until delivery has been made.

The California Uniform Sales Law provides:

"If the contract to sell requires the seller to deliver the goods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not pass until the goods have been delivered to the buyer or reached the place agreed upon." California Civil Code, Sec. 1739, Rule 5. See: Gilfallan v. Gilfallan, 1914, 168 Cal. 23, 141 P. 623, Ann.Cas.1915D, 784.

This is especially true in sales between merchants which contain F. O. B. provisions. Title, in such instances, does not pass until delivery at the point of shipment. The goods are at the risk of the seller until they are put on board. See: Wong Foo v. Southern Pacific Co., 1919, 41 Cal. App. 42, 181 P. 823; Whitaker v. Dunlap-Morgan Company, 1919, 44 Cal.App. 140, 186 P. 181; Lewis v. Farmers' Grain & Milling Co., 1921, 52 Cal.App. 211, 198 P. 426; American Factors, Ltd. v. Goss, 1925, 72 Cal.App. 742, 238 P. 121. This is also the general rule elsewhere. See Note, F. O. B. provision in sale contract as affecting time or place of passing of title, 101 A.L.R., 1936, 292.

In the meantime, full responsibility rests upon the seller. If the goods are destroyed in transit, the sale is not completed and the loss is the seller's. And this principle applies whether the delivery is made two blocks away by an employee of the produce company who carries a lug of tangerines on his shoulders, or several lugs on a hand-truck or dolly which he wheels through the market, or whether he delivers it by motor truck at a place designated by the buyer.

The Administrator seems to think that no delivery is a delivery unless it is actually made at some great distance, at the buyer's place of business. Perhaps if the Administrator had so defined delivery, we might be compelled to adopt this interpretation, although it would do violence to the law of sales. For such a definition would force upon the seller the responsibility for the loss of the goods, the risk resulting from the use of his equipment by his own employees, including injuries to these employees and others, and, at the same time, would deny him the right to make a charge for the delivery which has these hazards.

■ But the Administrator has not done so. My duty, therefore, as a judge, is to give to the word "delivery" a meaning which conforms to the accepted legal principles. It is well to bear in mind the warning of Mr. Justice Douglas that, in carrying out the objects of the statute under which the regulation was written to prevent inflation, the Administrator "does not carry the sole burden." Hecht Co. v. Bowles, 1944, 321 U.S. 321, 331, 64 S.Ct. 587.

The courts have a like responsibility, which must be exercised in the light of recognized legal principles. Hence we cannot give to the word "delivery" any other meaning than that which it has under known legal norms.

The injustice of a contrary interpretation in this case is apparent.

The market in which these men did business sprawls over many, many streets in the heart of the industrial district of Los Angeles, covering miles of territory. In the early morning, when the sales are made, the market is a conglomeration of piled up packing boxes, lugs and all sorts of containers filled with all kinds of fruits and vegetables. The floors are strewn with rejected fruits and vegetables. Water is running in all directions. The seller's employee who carries or trucks a load of fruit through the market to the place designated by the buyer, runs the risk of slipping, damaging the fruit and injuring himself. And yet, we would, under the interpretation of the Administrator, make the seller assume all these burdens while denying him the right to charge for the risk so incurred.

But the deliveries were not all of manual character. The evidence shows that, in many instances, deliveries were made on motor trucks of the buyers located several blocks away. This was especially true in

the case of chain stores which bought large quantities for sale at their individual stores. The transportation manager of one of these chains designated his company's truck standing several blocks away from the defendant's place of business as the place of delivery. The defendant's motor truck, driven by one of his employees, had to be used in transporting the goods to the place. In transit, the responsibility not only for the safety of the merchandise, but also for any accident which might result in damage to the seller's truck or to the property of others or injury to the driver or to any other persons was on the defendant. And the risk taken was just as great as if the delivery had been made twenty blocks away, at a store designated by the buyer.

I conclude, therefore, that in sales where deliveries, in the sense here indicated, were made, the defendant had the right to the additional mark-up.

■ In sum, the defendant, having the right to resell the tangerines bought from Ko on the basis of the price furnished by Ko, and adding thereto the proper mark-up in delivery cases, the price charged was correctly computed and there is no violation on account of that purchase.

The second purchase was from Nick Delis. It was 1130 lugs. The defendant's resale price on this shipment was $2.75 per lug on cash-and-carry sales and $3 on delivered sales. It is the Administrator's contention that the ceiling price, under the regulation, was $1.59 on cash-and-carry sales. The computation treats all the sales from this purchase, as such, would allow freight from El Centro, although shipment was actually made from San Francisco, and is as follows:

■ A consideration of the record in the case leads me to the conclusion that the defendant, having admitted in his answer that he received and sold the tangerines from Delis on consignment, he should not be allowed to change his position by contending, as he does now, that while he originally bought the tangerines outright, he, in reality, only settled on a consignment basis. There is the added fact, which is undisputed, that in conferences in the local office of the Administrator, the defendant was given an opportunity to take a position as to this transaction and to say whether he would treat it as a direct purchase or as a purchase on consignment. He chose the latter.

■ Under the circumstances, the court must hold that this was a purchase on consignment and that in the sales from it, the defendant acted as a commission merchant, as defined in the regulation. The defendant, to compute his price, may add to the packer's maximum price for delivered sales, the transportation costs and his commission of 15 per cent, computed on the delivered maximum price. Sec. 1351.1404(c) and (b). On such a computation, some of the sales were at excessive prices.

While the Administrator is entitled to recover the excess, the exact amount remains to be determined under the principles here laid down.

■ The recovery will, however, be limited to the amount so found, without any trebling.

This is a clear case where the amendment contained in the Stabilization Extension Act of 1944, 50 U.S.C.A.Appendix §§ 901 et seq., 961 et seq., limiting recovery to the overcharge when the violation "was

| | | | |
|---|---|---|---|
| 28 pounds net at .045 lb. | = | $1.26 | Packer's F.O.B. ceiling price at point of shipment, El Centro, California. |
| Freight to Los Angeles via Pacific Freight Lines | | | |
| 32% of [.26 plus (3% of .26)] | | .09 | |
| | | $1.35 | Packer's delivered ceiling price to Los Angeles. |
| Commission 15% | | .24 | |
| | | $1.59 | Commission Merchant's ceiling price in Los Angeles. |

neither wilful nor the result of failure to take practicable precautions against the occurrence of the violation," should be given full effect.

■ Wilfulness, when used to characterize an act in the realm of criminal law, means more than mere voluntariness. It implies a purposeful design to do a thing with evil or illegal design. As said in United States v. Murdock, 1933, 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381:

" * * * when used in a criminal statute, it generally means an act done with a bad purpose (Felton v. United States, 96 U.S. 699, 24 L.Ed. 875; Potter v. United States, 155 U.S. 438, 15 S.Ct. 144, 39 L. Ed. 214; * * * Williams v. People, 26 Colo. 272, 57 P. 701; People v. Jewell, 138 Mich. 620, 101 N.W. 835; St. Louis, I. M. & S. Ry. Co. v. Batesville & W. Tel. Co., 80 Ark. 499, 97 S.W. 660; Clay v. State, 52 Tex.Cr.R. 555, 107 S.W. 1129); stubbornly, obstinately, perversely (Wales v. Miner, 89 Ind. 118, 127; Lynch v. Commonwealth, 131 Va. 762, 109 S.E. 427; Claus v. Chicago G. W. Ry. Co., 136 Iowa 7, 111 N.W. 15; State v. Harwell, 129 N. C. 550, 40 S.E. 48). The word is also employed to characterize a thing done without ground for believing it is lawful (Roby v. Newton, 121 Ga. 679, 49 S.E. 694, 68 L. R.A. 601), or *conduct marked by careless disregard whether or not one has the right so to act* (United States v. Philadelphia & R. Ry. Co., D.C., 223 F. 207, 210; State v. Sayre, 129 Iowa 122, 105 N.W. 387, 3 L.R.A.,N.S., 455, 113 Am.St.Rep. 452; State v. Morgan, 136 N.C. 628, 48 S.E. 670)." (Italics added)

And see: Spies v. United States, 1943, 317 U.S. 492, 497, 498, 63 S.Ct. 364, 87 L. Ed. 418.

The defendant acted in good faith. He sought and obtained information as to the price to be charged from the Office of Price Administration itself. It is true that he did not receive a written order which is binding on the Administrator. But the contemporaneous evidence shows that information as to price was actually received, reduced to a written memorandum, which is now in evidence, and was acted on. Even on the question of delivery, the defendant sought advice of counsel and adopted a view which is the view of this court.

We do not have here a failure to give proper instructions to employees, which re-sulted in violations. These transactions were carried on by the general manager himself. He sought information upon which to base the price at which he resold the product during the short period which elapsed from the time he received it and resold it to various retailers.

In addition to these earmarks of good faith, there is lacking any evidence of other violations or even disputes as to price matters.

■ It is a cardinal rule of law that when intent, knowledge, or design are in issue, either in a criminal or civil cause, other acts of similar character may be offered to prove them. This doctrine was declared by the Supreme Court as early as 1842. Wood v. United States, 1842, 16 Pet. 342, 343, 360, 10 L.Ed. 987. It has been adhered to ever since and applied to a great variety of offenses in which motive, knowledge, wilfulness or specific intent are elements to be proved. See: Schultz v. United States, 8 Cir. 1912, 200 F. 234; Kinser v. United States, 8 Cir. 1916, 231 F. 856, 860; Riddell v. United States, 9 Cir. 1917, 244 F. 695, 700, 701; Davis v. United States, 8 Cir. 1925, 9 F.2d 826, 830; Morris v. United States, 5 Cir. 1940, 112 F.2d 522; Brickey v. United States, 8 Cir. 1941, 123 F.2d 341; National Labor Relations Board v. National Seal Corporation, 2 Cir. 1942, 127 F.2d 776, 779. Under this principle, the Administrator, either in his case in chief or in rebutting the evidence offered by the defendant to prove that his acts were not wilful within the meaning of the amendment, could have shown other violations, although no recovery was sought on them. *None were shown here.*

The tangerine venture was a single venture in which the defendant engaged in order to secure, for some of his customers for the Christmas season, the few tangerines which happened to be on the market in California at that time.

To penalize him under these circumstances would be an act of extreme injustice, and would frustrate the intention of the Congress in making wilfulness and failure to take proper precautions, in other words, i e., *lack of good faith,* the only basis for the imposition of treble damages in an action brought by an individual or by the Administrator.

■ One more matter: I feel that in computing the resale prices from the Delis consignment, allowance should be made for

the actual freight paid from San Francisco to Los Angeles.

I concede that the Office of Price Administration, in establishing a formula for computing the prices on tangerines or other commodities, may establish a terminus from which freight may be paid. The regulation here involved—assuming the sale to have been one from a packer to an intermediate seller—calls for freight from the packing house. Sec. 1351.1404(c) and (f).

However, in this case, it is clear that, while the tangerines may have been packed originally in Imperial Valley, they were transported by their packer first to Los Angeles and then to San Francisco. Freight was prepaid on them, and they were shipped from San Francisco to Los Angeles. There is no evidence that Delis may not have had a packing house in San Francisco. Many large California packers have packing houses in various sections of the state. Under the circumstances, I think that the actual freight paid should be considered in making the computation in order to determine what the overcharges were on the sales from this consignment.

Judgment will be for the Administrator, recovery to be limited to the overcharges on the sales from the Delis purchase, computation to be made in accordance with the views here expressed.

Formal findings and judgment to follow.