### AUGUST v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. March 27, 1918.)

#### No. 5216.

1. CRIMINAL LAW ⬅450—OPINION EVIDENCE—MATTER IN ISSUE.
   On trial of an indictment charging an offer to bribe members of a draft board to exempt a person from service, the understanding of such members as to whether the words used by defendant constituted an offer *held* properly excluded as incompetent; this being the very matter in issue.

2. CRIMINAL LAW ⬅1055—APPEAL—DISREGARD OF TECHNICAL DEFECTS—EXCEPTIONS TO ARGUMENT.
   Under Judicial Code, § 269, as amended by Act Feb. 26, 1919, that "on the hearing of any appeal, certiorari, writ of error or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court without regard to technical errors, defects or exceptions which do not affect the substantial rights of the parties," it is the duty of the Circuit Court of Appeals to consider prejudicial remarks of counsel, although no exception was taken.

3. CRIMINAL LAW ⬅723(1)—IMPROPER ARGUMENT OF COUNSEL.
   Argument of counsel for the government in a prosecution for offering to bribe member of draft board, referring to the war with Germany, etc., *held* to contain such an appeal to prejudices of the jurors as was likely to prevent a fair consideration of the issues.

In Error to the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

Criminal prosecution by the United States against Albert J. August. Judgment of conviction, and defendant brings error. Reversed.

John G. Parkinson, of St. Joseph, Mo. (Benjamin Phillip and James W. Mytton, both of St. Joseph, Mo., on the brief), for plaintiff in error.

E. B. Silvers, Asst. U. S. Atty., of Kansas City, Mo. (Francis M. Wilson, U. S. Atty., of Kansas City, Mo., on the brief), for the United States.

Before HOOK and CARLAND, Circuit Judges, and AMIDON, District Judge.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

CARLAND, Circuit Judge. The plaintiff in error, hereinafter called defendant, was jointly indicted with one Kalis for violating section 39 of the federal Penal Code (Act March 4, 1909, c. 321, 35 Stat. 1096 [Comp. St. § 10203]). The indictment was in two counts. The first count charged, among other things, that the defendant did unlawfully, willfully, knowingly, corruptly, and feloniously offer the sum and amount of $500, the exact description of which was unknown to the grand jury, to one Walter P. Fulkerson, a member and chairman of the local board known and designated as the "Local Board for Division No. 3, City of St. Joseph, State of Missouri," with the corrupt intent and purpose to influence the decision and action of Fulkerson as chairman and member of said board in relation to the making of a physical examination of said Kalis and in passing upon and determining his physical qualifications for the military service of the United States. The second count was in the same language, except the person to whom the $500 was alleged to have been offered was one Walter L. Mack, a member and clerk of the above board. A trial on this indictment resulted in the acquittal of Kalis and the conviction of the defendant. From a judgment imposing a fine and imprisonment in the penitentiary, the case is here for review.

[1] To sustain the case of the prosecution, two separate conversations had by the defendant with Fulkerson and Mack were given in evidence. The conversation with the former, as testified to by him, was as follows:

"Well, Mr. August came up about—I think about 6 o'clock in the evening, and I had just gotten home from the Exemption Board, and he drove up and got out of his car and came up the steps. I turned around. I saw him getting out of his car, and I turned around to meet him; so I walked down the steps and he came up the steps. I live on a terrace probably 10 or 12 steps high; and we met and probably shook hands. I don't remember whether we did that or not; but Mr. August just said—he says, 'W. P.,' he says, 'How can we get this boy off?' And I had in mind his son. I said, 'What boy do you refer to? or 'What boy are you talking about?' something like that, and he said, 'Why, Ike Kalis.' He says, 'You know Ike.' And about that time Ike hollered at me. Ike was either in the car, or getting out of the car, just down below. Ike hollered at me, and then I recognized him, and A. J. told me it was Joe's brother, and I said, 'Well, I remember him now.' And I told him I didn't know of any way to get Ike off. I said I didn't know of any way to get Ike off, if he is eligible to go; and he said, 'Well, he saw'—he says, 'I just can't afford to have this boy go, it'll ruin his business.' I thing he mentioned, 'It will kill his old father—going to ruin his business,' and he says, 'I can't—just can't afford to have this boy go; I must get this boy off some way'—something like that."

Counsel for the United States then asked the following questions and the witness replied as here stated:

"Q. Yes; well, for the purpose of refreshing your recollection, I will get you to state on that occasion if Mr. August didn't say to you, 'I would rather give $500 out of my own pocket right this minute than to lose this boy.' A. Well, substantially that.

"Q. Yes; you know whether or not he did say that, Mr. Fulkerson—'I would rather give $500 out of my pocket right this minute than to lose that boy?' A. I think he said, 'I would rather lose $500,' or 'I would rather give $500, than to see this boy go. I would rather go myself.' Of course, it has been a good while ago for me to say he said. 'Right this minute;' I don't know that he said that. The idea was that he didn't want this boy to go.

"Q. Your recollection would be probably better in September, when the grand jury met, than after the passage of this much time?   A. Yes.

"Q. Now, Mr. Fulkerson, I desire to put this question before you again— if he didn't say to you in that conversation, 'I would rather give $500 out of my pocket right this minute than to lose that boy'—if he didn't say that to you as near as you can recollect?   A. Well, he said something like that; yes. He said he would rather go himself.   Well, I made fun of him, and he said, 'Well, I would rather go myself—I would rather than $500 not to see this boy have to go.'  'I would rather than anything,' he says, 'I can't afford to have this boy go;' and I just turned it off in a joke with him, and I said, 'Why, A. J., you know you're getting too old to go, and no use talking that way,' and we discussed it in this way."

On cross-examination the witness testified:

"Oh, he just said, 'I can't have this boy go.' He says, 'I would rather go myself—I would rather give $500 out of my pocket than to see this boy go.' I said, as I have stated, 'It is out of the question about you going to war; you can't go to war.'"

Counsel for defendant then asked the following questions on cross-examination and they were ruled upon by the trial court as follows:

"Mr. Parkinson: You never heard Mr. August at any time say anything out at your home that indicated that he intended to corrupt you, or anything of that kind; you never heard him say anything that indicated that?

"Senator Wilson: We object to that, for that is the question to be determined by this jury. That is what this lawsuit is about; what he meant by it.

"The Court: Sustained.

"Mr. Parkinson: Well, we except to the ruling of the court.

"The Court: He may state what was said, but he can't give his opinion about it.

"Q. Well, Mr. Fulkerson, did you hear Mr. August say anything the night he was out at your home that would indicate to you that he wanted to give you $500 to do anything for or against—for or against this man's being taken into the army or being left out?

"Senator Wilson: We object to that.

"The Court: Objection sustained.

"Mr. Parkinson: We again except. We offer to prove by this witness that nothing was said there that indicated to him that Mr. August intended to brike him, or offered to bribe him, or offered him in any sense $500, or anything of that kind, in the sense of offering it to him, in the sense of its being offered to him to influence his action, or anything of that kind.

"The Court: The offer is rejected, upon the ground that the witness has stated what was said, and it is for the jury to determine what the purpose was, and the witness is not entitled to state his conception of it.

"Mr. Parkinson: Q. Mr. Fulkerson, did Mr. August offer you $500—where is that indictment—did Mr. August offer you $500, or any other sum at your home that night—offer to you—

"Senator Wilson: That is the same question asked over again.

"The Court: Well, the court will permit whatever is proper about that. If you mean the tender, the physical tender, of money, if you mean by that an interpretation of what those words meant, the court has ruled on that. If you mean to ask him whether he had $500 there which he offered him physically, of course, you may answer that. He has already answered that, and said he did not.

"Mr. Parkinson: Well, this man has been charged on a certain date with— Mr. August has been charged with offering him $500, and now I want to ask him whether in the language of the indictment this is the man—whether on that night, or at any other time, he offered him $500, or any other sum.

"The Court: If you want to put that on that ground, the ground of physical offer of money; that is, that the money was there which he offered—

"Mr. Parkinson (interrupting): No.

"The Court: If that is not what you mean, then the objection is sustained.

"Mr. Parkinson: We except."

The conversation had with Mack as related by him was as follows:

"So we took a drink of root beer, I believe, if I remember correctly, and turned around and came outside of the store, and Mr. August says, 'Mack, I want you to do something for me;' and I said, 'What is it, A. J.?' This man Ike Kalis comes up before your board for examination; I don't want him to go to war.' I said, 'Mr. August, if he passes the physical examination, he will have to go to war, so far as my—so far as I am concerned. I couldn't do any different if he was a brother of mine.' He said, 'I can't afford to lose that man; he's a mighty valuable man. I wouldn't have him go to war for $500 out of my own pocket.' I said, 'If he passes the examination, Mr. August, he will have to go the same as any other boy.' He says, 'How about your doctor?' I says, 'I don't believe you could touch him with a million. You would insult him if you would say anything to him.' He says, 'How about Dr. Weary?' And I repeated what I have said. He said, 'How about Dr. Ladd?' I said, 'If he passes the examination before Dr. Weary, he will never get to Dr. Ladd. If he fails to pass Dr. Weary, he will be re-examined in the afternoon before Dr. Ladd and Mr. Fulkerson.' "

Counsel for defendant on cross-examination made the following offer, which was denied, and counsel, out of deference to the ruling of the court when Fulkerson was on the stand, pursued the matter no further:

"I offer to prove by this witness that he did not understand by anything that Mr. August said that he intended to corruptly influence him to do anything improper to either admit or reject Mr. Kalis into the army."

These rulings of the trial court are assigned as error. There was no error in the above rulings of the court. How Fulkerson and Mack understood the language used by the defendant, or whether they understood it at all, was immaterial. What the language meant was a question for the jury, and the opinions of Fulkerson and Mack as to what it meant were inadmissible. Cases cited by counsel for defendant on this point are not applicable. The inadmissibility of the evidence ruled out is made to appear at once, if we suppose counsel for the United States endeavoring to prove his case in the same way from a willing witness. If this was attempted, counsel for defendant would vigorously protest, and he would be right in so doing. There was evidence to take the case to the jury. The indictment was good against a motion in arrest. Such motions are not favored. They only reach a pleading that is wholly bad. Baker v. Warner, 231 U. S. 588–592, 34 Sup. Ct. 175, 58 L. Ed. 384.

[2] We see no reversible error in the charge of the court. We are of the opinion, however, that the judgment below must be reversed for error committed by the Assistant United States Attorney in his argument to the jury. There were no exceptions taken at the trial to the remarks of counsel, and it has been the uniform ruling of this court that such exceptions are necessary in order for this court to review the error if any. Cudahy Packing Co. v. Skoumal, 60 C. C. A. 306–313, 125 Fed. 470, 477; Union Pacific R. Co. v. Field, 69 C. C. A. 536–538, 137 Fed. 14, 16; Chambers v. United States, 237 Fed. 520, 150 C. C. A. 395.

We think, whatever may be our power otherwise, or our inclination to exercise it, the late amendment to section 269, Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1163, as amended by Act Feb. 26, 1919, c. 48), fully authorizes and commands us to look to the entire record before the court, and render judgment without regard to the technical error of the want of exceptions to the remarks of counsel. The amendment reads as follows:

"On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties." Public—No. 281—65th Congress.

[3] There were two issues submitted to the jury by the trial court: (1) Did the conversations in evidence constitute an offer of money to Fulkerson and Mack? (2) If they did, were such offers made with the intent to influence their decision in relation to the matter charged? The issues being as stated, the Assistant United States Attorney, in making the opening argument for the prosecution, spoke as follows:

"Of course, the gravity of this event is not to be measured, and the influence of what you do here to-day is not to be calculated. It will be unnecessary, probably would be unfitting, for me to remark at any length as to the momentousness of the events that are transpiring in the world to-day; but I feel it is impossible for me to refrain from some reference to those things, and the relevancy of those events to the trial that here is proceeding will justify my remarks along that line.

"You know different people view different things in different ways. That which deeply impresses one man may be considered by another with no great concern; but as for me, gentlemen, in thinking of the causes which precipitated the entrance of America into the great struggle which now embraces practically all mankind, I can consider the evil imaginations of the emissaries of the German government in this country while we were yet at peace and neutral, with some calmness; I can even think of the illegal establishment of a blockade, and the futile manner in which it was sought to be enforced, without any great heat. But when I come to think of the outrages that have been committed against helpless, defenseless, and unsuspecting peoples—when I think of the atrocities committed against the women and the helpless children of France, and of Belgium, and of Serbia, and of Armenia, and of Poland, when I think of the outrages committed against womanhood throughout Europe, without justification, without provocation, without cause, and without reason, save to gratify the ambition of a war lord, and to satisfy the lust of his followers, my blood boils, and I know, gentlemen, that our cause is a just cause, and a righteous cause, and the entrance of America into this war is a just entrance, and a righteous act, and when I think of those things I turn to Him whose omnipotence has always upheld the arm of the righteous and confounded the wicked, who has always lent succor to the helpless and consolation to those who are sad of heart, and I turn to Him with an unswerving faith that despite the numbers of the enemy, despite their preparation, despite schemes and their ingenuity, and despite even the villainous and traitorous conduct of some even among us who would thwart and impede the work of our Lord in this great struggle, in spite of all these things, I cannot help but feel that somehow in His omnipotence eventually He will see our boys come home crowned with the laurels of victory.

"I say, gentlemen, that the gravity of the things that we do here to-day is not to be measured, and, as I said a while ago, I have a feeling of sincerest pride to be engaged in this prosecution. On the other hand, I have some sense of chagrin; not that my task is obnoxious, or that my duty is onerous; not that. But, gentlemen, I was born and raised in the state of Missouri, and

it is not without some sense of shame that I stand here in this public court to prosecute one whom I am convinced while living within the borders of that lovely state, whose name and emblem I revere as second only to that of the nation, of which she forms a part, I say that I feel a sense of shame that there is within her borders one so low and so vile that he would employ his efforts, his influence, and his filthy gold to thwart and impede the efforts of his nation, which has blessed him so abundantly with security and with happiness and with prosperity and the things of this world.

"You know, I came from the southwestern part of this state, and we folks down there have always looked upon northwest Missouri as a great territory peopled by noble people. This is my first experience in this division of this court, and yesterday morning, when I looked at this panel as they came into court, and the first I looked over the faces of the spectators who had assembled here, I said to myself that my estimation of the character and quality of the people of northwest Missouri had never been too high, and I trust and believe that the outcome of this prosecution will not necessitate that I shall in any wise revise the high opinion that I have always entertained of northwest Missouri and her people.

"I said awhile ago that the gravity of this occasion is not to be measured, and it is not. It is not as though, gentlemen, we were prosecuting some one on a charge of having stolen a horse or a cow, for then only a few people would be directly interested. It is not, gentlemen, as though we were prosecuting some one on a charge of murder, for in that case only a comparatively small community would be directly interested. You know we are prone to think of the crime of an attempt to corrupt the courts as being very heinous and striking at the very foundations of our institutions. Gentlemen, this occasion and this prosecution is more grave than were it a prosecution against some one for having attempted to corrupt his honor on the bench, though in such a case only the immediate litigants involved would be directly interested or affected. *But to-day, gentlemen, the world is engaged in a war, the whole world is engaged in a war for humanity; a war which holds in its balance the very future of the race; a war for the rights, the sacred rights, of man, and the honor of womanhood, and the security and sanctity of little children; and we are here engaged in the prosecution of one who, as I am convinced, was willing to place his influence and his efforts and his filthy gold in the scales against those things which all men hold most dear.*

*"This prosecution, gentlemen, will not affect only St. Joseph. It will not only affect Buchanan county. It will not only affect northwest Missouri, and reflect either dishonor or credit upon her; but the result of you gentlemen's deliberations will be heralded to every nook and every corner of this land; yea, and in some way I doubt not it shall waft its way to the agents of hell opposed to us across the mighty waters, and there, gentlemen, the verdict of this jury will be read and heard by the war lords of Germany as a beat from the pulse of the American people. So I say that the gravity of this occasion cannot be measured, and I trust gentlemen, that you will consider this case carefully— that you will consider very, very deliberately."*

The case was tried on March 5, 6, 7, and 8, 1918. On these dates it was not necessary to inflame the passions of jurors by talking about the enemies of our country, rather was it a time to caution jurors against allowing their prejudices and patriotism from swaying their judgment. But the Assistant United States Attorney so far transcended his duty as a prosecuting officer that we are clearly of the opinion that the conviction of the defendant ought not to stand. The language used speaks for itself. It must have produced a situation in the minds of the jurors that destroyed a calm consideration of the rights of the defendant. The United States cannot afford to convict her citizens in this manner. There was no case against Kalis. The court directed a verdict in his favor on one count, and there was no evidence to

convict him on the other. His acquittal, therefore, cannot be urged in support of the proposition that the jury acted without prejudice.

The judgment below is reversed, and a new trial ordered.