## DAVIS v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. November 19, 1925.)

No. 6865.

1. **Criminal law ⬅595(10), 598(7)—Refusal of continuance, because of absence of accused's codefendant, held not abuse of discretion.**

Court did not abuse discretion in refusing continuance because of absence of accused's codefendant, in absence of showing that accused subpœnaed him as witness, or that it would be possible to procure him as witness, and that, if procured, his testimony would be available.

2. **Criminal law ⬅673(4)—Letter of accused's codefendant held properly admitted against accused.**

Where there was substantial evidence of concert between accused and his codefendants to use mails to defraud, in violation of Penal Code, § 215 (Comp. St. § 10385), letter written by accused's codefendant was properly admitted, in view of instruction not to consider it against accused unless joint purpose was first found.

3. **Criminal law ⬅427(5)—Evidence held sufficient to establish union of purpose to use mails to defraud.**

Evidence *held* sufficient to establish union of purpose between accused and his codefendants in carrying out scheme to defraud by use of mails, in violation of Penal Code, § 215 (Comp. St. § 10385).

4. **Post office ⬅48(8)—Evidence of letters not mentioned in indictment held admissible, in prosecution for using mails to defraud.**

Evidence of letters not mentioned in indictment, but of similar character, is admissible in prosecution for using mails to defraud, in violation of Penal Code, § 215 (Comp. St. § 10385).

5. **Criminal law ⬅1036(1), 1038(1)—Appellate court should not consider objections to evidence or charge not raised in trial court, except in exceptional circumstances.**

Appellate court should not consider objections to admission or exclusion of evidence or to charge, not raised in trial court, except under exceptional circumstances, notwithstanding Judicial Code, § 269, as amended (Comp. St. Ann. Supp. 1919, § 1246).

6. **Criminal law ⬅1030(1), 1048, 1129(1)—Appellate courts may correct serious trial errors, though not challenged by objections, exceptions, or assignments of error.**

In criminal cases involving accused's life or liberty, appellate courts, in interest of just enforcement of law, may correct serious trial errors fatal to accused's rights, though not challenged or reserved by objections, exceptions, or assignments of error.

In Error to the District Court of the United States for the Western District of Arkansas; Frank A. Youmans, Judge.

Samuel E. Davis and others were convicted of using the mails in a fraudulent scheme to obtain money by false and fraudulent representations and promises, in violation of Penal Code, § 215, and the defendant named brings error. Affirmed.

William H. Arnold, Jr., of Texarkana, Ark. (William H. Arnold and David C. Arnold, both of Texarkana, Ark., on the brief), for plaintiff in error.

S. S. Langley, U. S. Atty., of Ft. Smith, Ark. (James D. Shaver, Sp. Asst. U. S. Atty., of Texarkana, Ark., and H. L. Arterberry and Sylvester R. Rush, Sp. Asst. Attys. Gen., on the brief), for the United States.

Before KENYON and BOOTH, Circuit Judges, and AMIDON, District Judge.

BOOTH, Circuit Judge. Plaintiff in error, Samuel E. Davis, together with R. A. Cox, known as Jimmie Cox, and the American Trust Company, were charged in an indictment containing seven counts with making use of the United States mails in execution of a scheme to obtain money by means of false and fraudulent representations and promises, in violation of section 215 of the Penal Code (Comp. St. § 10385). Davis and the Trust Company were tried together. They were found guilty on counts 2, 3, 4, 5, and 7, not guilty on count 1, and not guilty on count 6 by direction of the court. Writ of error was sued out by Davis alone. Cox failed to appear at the trial, and his bond was forfeited.

The indictment charged that the alleged scheme included the organization of certain oil stock promotion companies, pools, or syndicates, to wit, the American Investors' Lease Pool, formed for the purpose of buying acreage supposed to be oil lands, and the Columbia Pipe Line Company, organized for the pretended purpose of transporting oil, "but in truth and in fact both said Lease Pool and Pipe Line Company were organized by the said defendants for the purpose of selling shares or certificates of interest therein, and to appropriate to their own use and benefit large sums of money and property so sent to them and received in payment therefor"; that it was further part of the scheme to make use of the American Trust Company, an alleged brokerage company, by having it send out so-called market letters and other information; that it was further a part of said scheme that a report should be spread among persons to be defrauded that a certain well which had been drilled by Cox, and which was in fact a dry hole or a salt water well, was in fact a gusher, but that the report as to its being a salt water well was being spread, so as to depress the value of the surrounding lands, to the end that they might be purchased cheaply with the moneys furnished by the widely scattered persons to be defrauded.

The indictment then set out the making of a large number of alleged false and fraudulent representations—among others, that Cox had struck a gusher on his 800-acre lease; that he had ordered it to be mudded in, so that he and his associates might spread the report that it was a salt water well, and thereby enable them to buy cheaply leases on the surrounding acreage; that the American Trust Company had put in $30,000 of its own money, and that it was to have 10 per cent. only of the profits for its services in buying the leases on the surrounding acreage; that said leases would sell for from $1,000 to $10,000 per acre as soon as Cox turned loose his well; that the deal would make the investors 100 to 1; that as soon as the acreage was paid for, which would be by April 18, 1923, the well would be turned loose, and that then the acreage would be sold in about 10 days, and each investor would receive his pro rata share; that Cox could get the money needed for the purchase of the leases in El Dorado, where he lived, but that he was trying to repay the parties who in the past had had faith in him, by letting them in on the deal; that the Standard Oil Company had purchased 27,000 acres around him and had made location for 75 wells; that the American Trust Company had bought thousands of acres and were short of cash, and that this was the reason they were letting their friends in on the deal; that defendants could secure the leases at $15 to $75 per acre; that they could be easily sold for 100 to 300 times the price, as soon as defendants let the oil well come in as a gusher; that defendants could sell all their leases for $6,000 per acre—$2,000 in cash and $4,000 in oil—and that the investment would prove to be the greatest investment ever offered; that these figures were facts, not possibilities or promises; that Cox had the well on his own acreage, and that the other defendants had nothing to do with it, though they advised people to keep Jimmie Cox units if they owned any; that the investment offered a clean profit of 120 to 1 or better.

The indictment further charged that each and all of the foregoing representations were false, and known to be false by the defendants. The indictment then charged that the defendants, having so devised the scheme to defraud, did, for the purpose of executing said scheme, on the 13th day of April, 1923, at El Dorado, Ark., and within the jurisdiction of the court, place in the post office of the United States at El Dorado, to be sent and delivered by the post office establishment of the United States to the addressee thereof, a letter inclosed in a postpaid envelope addressed to Henry Grant, at Des Moines, Iowa —the letter being set forth at length. The remaining counts adopted the allegations of the first count, and charged respectively the placing of other letters in the mail for the purpose of executing said scheme. The letter in the first count was one written by Cox. The letters in the other counts were signed

either by the American Trust Company or by one of its officers.

[1] At the trial, the defendant Davis conducted his own case. After conviction, he sued out a writ of error, and in connection therewith filed four assignments of error. The first was that the court erred in not granting a motion for continuance based upon the absence of the defendant Cox. There was no showing on the part of Davis that he had subpœnaed Cox as a witness; there was no showing that it would ever be possible to procure Cox as a witness; and there was no showing that, if he were procured, his testimony would be available, inasmuch as he also was under indictment. Under these circumstances, we think the court did not abuse its discretion in denying the motion for continuance.

[2] The second assignment of error challenges the introduction in evidence and submission to the jury of the Cox letter included in the first count, and the fourth assignment of error challenges the introduction of the same letter in connection with the testimony of the witness Grant Henry.

At the time this letter was offered in evidence, the court said: "Unless there is testimony showing a connection between Jimmie Cox and S. E. Davis, then this letter would have no effect. Before the jury could consider this letter, they would have to find from the testimony in the case that there was a union of purpose between Jimmie Cox and S. E. Davis with reference to the alleged scheme. It will be received for that purpose. The jury will understand, however, that unless they find from the testimony that there was a connection between the two in carrying out a scheme, if there was a scheme, they are not to consider this letter."

And, again, when it was offered, the court said: "I stated to you on yesterday, gentlemen of the jury, that the letters purported to have been written by Cox will be considered by you only if you find from the testimony, or the testimony that there was an agreement or a concert of action between Jimmie Cox and S. E. Davis for the purpose of forming a scheme to defraud, or to obtain property by fraudulent representations, if you find that there was any such scheme. If there was no concert of action, then you will not consider the Jimmie Cox letters. You will consider the letters only that were sent out by Mr. Davis and the American Trust Company in so far as the defendant Davis and the American Trust Company is concerned. If, however, you find there was a concert of action,

an agreement between the two to carry out a scheme to defraud, and that letters were mailed by either one of them, by either Cox or Davis, after such an agreement, then you will consider both the Cox letters and the Davis letters and the American Trust Company."

In its charge to the jury, the court said in reference to this letter: "Now, the first count of this indictment charges that there was mailed a letter which purports to have been written by Cox. Now the defendant Davis and the American Trust Company cannot be found guilty upon that count, unless you find from the testimony beyond a reasonable doubt that Cox and Davis and the American Trust Company were working together in concert to carry out this particular plan. If you find that they were, and that Cox mailed that letter in pursuance of that plan, then Davis and the American Trust Company are just as guilty as Cox upon that particular count. So you will take that into consideration, so far as the first count is concerned. * * * Now, as stated to you, there are a great many facts—in fact, most of the facts—that are undisputed by Mr. Davis. He admits that the letters were sent out by him. He does not admit that he had anything to do with the Cox letter, the one in the first count. You will have to take that into consideration, and determine under the instructions I have given you whether that was mailed to carry out a scheme between him and Jimmie Cox."

It is thus apparent that the jury were carefully and fully instructed that they were to consider this Cox letter only if they found a connection between the American Trust Company and Davis on the one hand and Cox on the other. If the letter had been admitted in evidence solely in connection with the first count of the indictment, no question of error could be urged by reason of the verdict of not guilty on the first count. The letter was, however, admitted generally, but with conditions affixed by the court, as above set out. Answer must therefore be made to the question whether there was substantial evidence showing a prior connection of Davis and the Trust Company with Cox in the scheme to defraud.

[3] Davis was president of the American Trust Company, and with the help of two girls managed its business. The Cox letter was dated April 11, 1923. In the letter Cox tells of the drilling of the well and the striking of oil, and then proceeds:

"I called my crew together. 'Boys, that

40-acre offset to the well belongs to you fellows. That's my present to you loyal boys. You fellows have had the guts to stick, even while I was in jail. That's the least I can do for you. Now let's mud the well in and buy as much acreage around it as possible for my loyal partners,' and I had the crew to put out the report, 'It's turned to salt water.' You know what that means in an oil field; acreage for a song. I could not afford to buy it, as the farmers would know something was wrong; but I arranged with the American Trust Company to purchase all they could, they to receive 10 per cent. of the profits when the acreage was sold. They have put in about $30,000 of their own money. Through them we have been able to buy over 3,000 acres of leases and royalties at an average of $50 to $75 per acre. These leases will sell for from $1,000 to $10,000 per acre the minute I turn the well loose."

According to the testimony of Davis himself, this coming in of the well took place in February, 1923, and he further testified that he and the American Trust Company helped Cox drill the well and bought the casing. Davis further testified that on March 21, 1923, he sent a telegram to a prospective investor, in which the following appears: "We helped a promoter complete a well in wildcat territory. He got one for twenty to thirty thousand barrels. He mudded giving us chance to buy surrounding acreage. We now have sixteen hundred acres and will get about fifteen hundred more costing around seventy-five per acre. Will be easy to sell at several thousand an acre when well is turned loose."

In answer to the question, "So you did know something out there about the Jimmie Cox well?" Davis testified, "I certainly did; I tried my very best to bring the well in." Again, in answer to the question, "So you know from your own personal knowledge that there was no commercial quantity of oil ever produced from either one of those?" Davis testified, "There was not. Q. And you knew it all the time? A. I did." On March 1, 1923, more than a month prior to the Cox letter, the American Trust Company sent out to a prospective investor the following telegram:

"Been financing wildcat well under cover for past sixty days on three hundred acres we have it high gravity oil it flowed a gusher we pumped the hole full of mud and reported salt water in order to acquire all surrounding acreage this well will prove the greatest sensation in Arkansas if a hundred to one

in fifteen days or your money back on the barrel head appeals to you wire every dollar possible quick. No time for mail.

"American Trust Co."

This same telegram was sent by the American Trust Company to another prospective investor on March 8, 1923. On April 2, 1923, the American Trust Company sent a letter to a prospective investor. In the letter occur the following statements:

"R. A. Jimmie Cox started a wildcat well in section 30—15—17 about four months ago. He had a hard time of it. * * * He came to us for financial assistance and we gave it to him freely for we know Jimmie Cox better than any one else in Arkansas except his wife and baby boy. The results were, about fifteen days ago Mr. Cox walked into our office with his driller and after running all the scouts and drillers out he told his story. He had an oil well; it tried to break loose on him; it tried to flow wild, but they held it down, plugged the hole after pumping the well full of heavy mud and water, and then let the report leak out that he had a salt water well.

"We made no effort, of course, to stop the report until we could gather in all the cheap acreage possible. There were thousands of acres around this well that could be bought for a song, for our own price, and it was left up to us to buy them, and take care of Mr. Cox. Due to having bought several thousand acres in other parts of the fields, we were short of cash, which left us with nothing to do but to go to our friends and let them in, just as we go in ourselves."

And the witness Loucks testified that, in the propaganda literature that he received from Cox, reference was made to the American Trust Company, and in that received from the American Trust Company reference was made to Cox; so that, as the witness expressed it, "They are tied together."

In view of the foregoing, we think the contention cannot be sustained that there was no substantial evidence of concert of action between Cox on the one hand and the American Trust Company and Davis on the other, prior to the sending out of the Cox letter on April 11, 1923. And if there remained any possible doubt, it would be removed by the numerous and repeated references made to Cox and his well in the subsequent correspondence sent out by the American Trust Company, and by the references made to the American Trust Company in the subsequent correspondence sent out by Cox. Such being the state of the record, we are clearly of the

opinion that the Cox letter was properly received in evidence, not only in connection with the first count, but with the other counts as well.

[4] The remaining assignment of error by the defendant Davis challeges the admission of the testimony of the witness Alderman, on the ground that his name was not mentioned in the indictment. The testimony was properly admitted. Evidence of letters other than those set out in the indictment, but of similar character, is admissible as bearing. upon the intent to defraud. Withaup v. United States, 127 F. 530, 62 C. C. A. 328 (C. C. A. 8); Colt v. United States, 190 F. 305, 111 C. C. A. 205 (C. C. A. 8); Schultz v. United States, 200 F. 234, 118 C. C. A. 420 (C. C. A. 8); Trent v. United States, 228 F. 648, 143 C. C. A. 170 (C. C. A. 8); Samuels v. United States, 232 F. 536, 146 C. C. A. 494, Ann. Cas. 1917A, 711 (C. C. A. 8); Linn v. United States, 234 F. 543, 148 C. C. A. 309.

[5] Counsel for Davis in this court has asked the court to consider a large number of assignments of error which he has compiled, but which were not filed in accordance with rule 11 of this court. These assignments challenge (1) the admission of some items of testimony; (2) the rejection of other items; and (3) certain portions of the charge to the jury.

No objections were made on the trial to these various matters now complained of, but counsel asks consideration of the assignments notwithstanding the absence of objections, in view of the fact that defendant Davis tried his own case. We think a request of this kind should be granted, if at all, only under exceptional circumstances. There is no showing that the defendant Davis applied to the court to have counsel appointed for him. In our opinion it would not conduce to orderly practice to allow an attorney, after a case has been tried and brought to this court, to come in and offer assignments of error for consideration, in disregard of the rules of this court. The case of August v. United States, 257 F. 388, 168 C. C. A. 428 (C. C. A. 8), cited and relied upon by counsel for defendant, which at one time lent support to the doctrine that section 269 of the Judicial Code as amended (Comp. St. Ann. Supp. 1919, § 1246) required this court to examine the entire record and render judgment without regard to objections and exceptions, can no longer be considered an authority in that particular. See Feinberg v. United States, 2 F.(2d) 955 (C. C. A. 8).

[6] However, it is a well-established rule that "in criminal cases, involving the life or liberty of the accused, the appellate courts of the United States may notice and correct, in the interest of a just enforcement of the law, serious errors in the trial of their cases, fatal to the defendant's rights, although these errors were not challenged or reserved by objections, exceptions, or assignments of error." Lamento v. United States, 4 F.(2d) 901 (C. C. A. 8), and cases cited therein at p. 904.

With this rule in mind, we have examined the record in the light of the assignments of error prepared by counsel, but we find no error of such character as would warrant us in reversing the judgment under the rule above stated.

Judgment affirmed.