BLUE v. STATE OF INDIANA

[No. 28,094. Filed June 21, 1946. Rehearing denied September 23, 1946.]

*Eggeman, Reed & Cleland,* of Fort Wayne, and *Seth E. Rowdabaugh,* of Warsaw, for appellant.

*James A. Emmert,* Attorney General, *Frank E. Coughlin,* First Assistant Attorney General, and *Merl M. Wall,* Deputy Attorney General, for the State.

YOUNG, J.—A jury found appellant guilty of assault and battery upon Paul Burgess and fixed a penalty of a thousand dollars fine and six months imprisonment.

It appeared without contradiction that in connection with a strike automobiles were parked bumper to bumper at the entrance to the factory involved, so that it was impossible for persons seeking to enter the factory to do so without climbing over the automobiles. There was testimony that about 25 employees were present for the purpose of entering the factory to work, and that the sheriff of the county was there to assure them safe conduct across the picket line.

Burgess was an employee desiring to enter the premises of his employer and was the first to undertake the climb across the line of obstructing cars. With the sheriff immediately behind him, he stepped up on the touching bumpers of two cars and started across. There was not entire unanimity in the testimony of the witnesses, but all testified to facts amounting to the offense charged. The State's witnesses testified in effect that when appellant saw Burgess on the bumpers of the cars he came forward and struck Burgess in the chest and knocked him down. Appellant's witnesses testified in effect that when appellant saw Burgess climbing, across the bumpers of the cars he came forward and pushed Burgess back into the arms of the sheriff who was immediately behind Burgess. No witness testified that any serious physical harm was done to Burgess, and that is argued by appellant, but he was kept from entering the plant where he was employed as he desired to do. The seriousness of an assault and battery is not always measured by the physical harm done. The purpose of an assault and battery is not always to inflict personal injury. The purpose and effect may be to deprive the victim of freedom of action and conduct, as was the case here, and in such cases the physical damage done does not measure the gravity of the offense.

In his motion for a new trial and in the brief before this court, appellant says that the evidence was insufficient to sustain the verdict. As we have already pointed out there was uncontradicted evidence that appellant struck or pushed Burgess as he attempted to enter the factory for work. Notwithstanding the evidence of striking and pushing, appellant's counsel in their brief in this court argued that no assault and battery was committed, "unless merely block-

ing the way against one who was pushed against him can constitute an offense." If from this we are to understand that counsel believes that where a strike is in progress the strikers in the course of picketing have the right by physical blocking and pushing to prevent others from crossing the line set up by the strikers then we cannot agree with him. The right to strike is the right to cease work and is unquestioned. In connection with the right to strike is the right peacefully to picket the premises of the employer against whom the strike is directed, and in the exercise of the constitutional right of free speech by argument and persuasion peacefully to induce others to join the strikers. But the right to strike and the right to picket do not include the right to block entrances and by force, or threats of force, deny other persons the right to go in or upon their own property or to enter the premises to which they have been invited, expressly or by implication. *Carnegie-Illinois Steel* v. *U. S. W. of A.* (1946), 353 Pa. 420, 426, 429, 45 A. (2d) 857.

Appellant, in his brief, says that "the gravamen of appellant's appeal rests upon the ground that appellant's rights, guaranteed to him by Sections 13 and 15 of Article I of the Constitution of Indiana were invaded."

Section 13 of Article I of the Indiana Constitution is as follows:

> "In all criminal prosecutions, the accused shall have the right to a public trial, by an impartial jury, in the county in which the offense shall have been committed; to be heard by himself and counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor."

Section 15 of the same Article is as follows:

"No person arrested, or confined in jail, shall be treated with unnecessary rigor."

None of the rights guaranteed by these sections was violated.

However, the appellant also later refers to § 16 of Article I as giving rights that were denied this appellant. Section 16 is as follows:

"Excessive bail shall not be required. Excessive fines shall not be imposed. Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offense."

Appellant contends that rights under this section have been violated. He contends that the fine is excessive and the penalty is out of proportion to the offense committed. But the fine and imprisonment imposed is within the statute governing the offense charged. That being true, this court cannot interfere on account of its severity. *Lodyga and Mantych* v. *State of Indiana* (1932), 203 Ind. 494, 505, 179 N. E. 542; *Cox* v. *State of Indiana* (1932), 203 Ind. 544, 557, 177 N. E. 898; *McCulley* v. *The State* (1878), 62 Ind. 428; *Miller* v. *The State* (1898), 149 Ind. 607, 613, 49 N. E. 894. While fines and penalties should not be excessive, and must be proportioned to the nature of the offense, that does not mean that this court can set aside a conviction and sentence, within the statute, merely because on the record it may seem severe. It is the duty of the trial jury, on finding a defendant guilty of misdemeanor, to fix the penalty within the statute defining the offense. § 9-1819, Burns' 1933. If the statute under which this charge was laid is constitutional, then the punishment, being within the limits as fixed, is lawful and not contrary to § 16 of Article I of the Constitution of Indiana.

Section 16 is a limitation on the acts of the legislature and not a limitation on the discretion of a jury acting within the framework of a statute. *Miller* v. *The State, supra,* at page 613. In the case before us the statute is not questioned nor is it claimed that the sentence exceeded the statutory limitations.

Appellant principally urges as grounds for reversal misconduct of the prosecuting attorney in the cross-examination of witnesses and in argument. No objection was made during the course of the trial to the cross-examination referred to and no objection was made to the prosecutor's argument and no motion was made to set aside submission on account of either. Ordinarily failure to object to evidence or misconduct of counsel waives and cures any error in connection therewith. We are asked to ignore this rule and to consider whether there was such misconduct upon the part of the prosecutor and failure on the part of the judge and appellant's counsel as deprived appellant of his constitutional right to a fair trial.

The misconduct of the prosecutor claimed in connection with the cross-examination of witnesses consisted of questions the answers to which tended to show that the witnesses knew there was a war on, and knew that preventing employees from entering the factory retarded production of war material, but that the witnesses in effect placed their union and the strike ahead of war production. Some of the witnesses for the defendant went so far as to say that they did not care whether production of war material was retarded or not.

In argument to the jury the prosecutor referred with some bitterness to the strike and its effect upon war production and its effect upon the success of our military forces. This argument appears to have been directed not to the question of guilt but to

the extent of the penalty. Appellant argues vigorously that the conduct of the prosecutor in the course of cross-examination and in argument deprived him of a fair trial by injecting collateral labor and war issues which prejudiced the court and jury and resulted in a trial not for assault and battery but, quoting from appellant's brief, "for being a member of a labor union, for being out on strike, for being in a picket line, for endeavoring to prevent other employes from entering the plant where he was employed." It seems to us that these enumerated collateral issues were inherent in the case and that the case could not have been tried without a disclosure to the jury of the above quoted facts which appellant claims are collateral, and we are not certain that the criticized cross-examination was improper, and if the cross-examination was not improper arguing the facts elicited by such cross-examination was not improper. It will be borne in mind that by statute the burden of fixing the penalty in this case was upon the jury. The right of a jury to hear evidence in aggravation or mitigation of an offense was discussed in the case of *Kistler* v. *State* (1876), 54 Ind. 400, 403, 404. In that case the defendant on trial of the cause offered to prove, in mitigation of punishment, the fact that he had already been in prison for the same offense for a period of 18 months. The court refused to permit him to make this proof and error in such refusal was alleged in this court. This court pointed out that under the old law when the trial court fixed the penalty it was entitled to have brought to its attention circumstances, whether in aggravation or in mitigation, which would help it in the exercise of its discretion in fixing the penalty. This court then applied the same principle to juries and held that juries, to guide them in fixing penalties, are entitled to

hear testimony of mitigating or aggravating circumstances, and on page 404 said:

"In considering the question of the nature or the extent of the punishment, the juries are now fairly entitled to all the latitude which the courts have rightly exercised, in hearing evidence tending to enlighten them in the exercise of a sound judicial discretion."

This being true, we are unwilling to say that evidence of the effect of the strike upon war production is not included in the circumstances which the jury was entitled to consider in discharging its duty of fixing the penalty.

We further suggest that the trial court in its discretion has wide latitude in permitting cross-examination to test the credibility of a witness by disclosing his general attitude toward the circumstances of the case, his interest, his motives, his prejudices, character and other influences which operate upon the mind, and only clear abuse of such discretion demands reversal. *Lincoln* v. *State* (1921), 191 Ind. 426, 133 N. E. 351; *Denny* v. *State* (1921), 190 Ind. 176, 129 N. E. 308; *Craig, Exrx.* v. *Citizens Trust Company* (1940), 217 Ind. 434, 451, 26 N. E. (2d) 1006; *Perfect* v. *State* (1925), 197 Ind. 401, 141 N. E. 52.

Appellant contends that a defendant in a criminal case is entitled to a fair trial before an impartial judge and a jury motivated only by proper considerations and to be represented by competent counsel, and that failure of his own counsel and misconduct of the judge and prosecutor which violate his constitutional right to such a trial may be raised in this court even though the proper and, ordinarily, necessary procedural objections have not been made. That, of course, is true, but injustice must be made clearly to appear, and appellate courts very properly have been

slow to intervene in such cases. In this connection appellant has cited a number of cases from this and other jurisdictions. To discuss all the cases would unduly prolong this opinion. We may say, however, that with a single exception, no Indiana case cited was reversed for misconduct or failure of court or counsel when objection was not made at the trial. The exception is the case of *Wilson* v. *State* (1943), 222 Ind. 63, 51 N. E. (2d) 848. In that case appellant's grounds for complaint were stated in the following language on page 66:

> "His position may be summarized by the statement that appellant was deprived of fundamental rights guaranteed by our constitution in that he had merely a perfunctory representation by counsel in a trial before a judge who was not impartial but stepped out of his proper role on several occasions to assist in the prosecution and to convey to the jury his opinion that the appellant was not worthy of belief."

and in conclusion at page 83:

> "When, as here, there has been such a lack of representation as to be equivalent to or worse than no representation whatsoever and as a result thereof the judge misused the opportunity thus given to impress upon the jury his view that the defendant was guilty and ought to be convicted, we are left with no alternative but to exercise the power that is in this court to remand the cause for such a trial as will not deny but will afford to the accused the protection guaranteed by our Bill of Rights and the Constitution of the United States."

No such situation is found in the case before us. Appellant had more than perfunctory representation. His attorney was of his own selection. By his own admission in his brief here, prepared by a new lawyer, his case was tried by "a lawyer of wide trial experience" whose reputation was "unimpeachable." Nine witnesses

were called for defendant against five for the State. They were intelligently examined and the State's witnesses were intelligently cross-examined. The only fault found with his conduct of this case was his failure to object to the cross-examination and the argument of the prosecutor. What to do was a matter of judgment and discretion in the heat of a trial. He had a case where he could not rely on his client's innocence. He may have thought one or more or all the members of the jury would respond to the labor union angle, or he may have hoped that the prosecutor's methods would excite sympathy. Having elected to follow the course he did, his client can't wait for the result, and then complain.

In the case before us the judge did not, as in the Wilson case, step out of his proper role to convey to the jury that he thought the defendant guilty. One criticism of him is that he should have voluntarily intervened during the prosecutor's cross-examination and argument. He was present. He knew the situation in a way that cannot be translated into a printed record. By overruling the motion for a new trial when these same questions were presented, he has said the defendant had a fair trial. For reasons already stated we cannot say he, with his better opportunity to judge, was wrong.

Appellant also questions three instructions given by the court. No objections to these instructions were made in accordance with the rules and no proposition or point in appellant's brief was addressed to them. Criticism of them is tied into argument as to the fairness of the trial. In that connection we have considered them and don't believe they prejudiced the appellant.

For the foregoing reasons and because evidence of guilt of the offense charged is so perfectly clear, we

are not disposed to reverse this case upon alleged errors to which no objection was made at the proper time.

Judgment affirmed.

Richman, J., dissents with opinion.

NOTE.—Reported in 67 N. E. (2d) 377.

## DISSENTING OPINION

RICHMAN, J.—I entertain no doubt of appellant's guilt of the crime of assault and battery. I condemn his resort to force to maintain a picket line. Whether he struck a hard blow or merely "body-blocked" a gap in a barricade, his act amounted to an unprovoked assault for which he is subject to punishment. I agree that a jury may consider evidence .in aggravation or mitigation of the offense, but, with this very important reservation, that the evidence of aggravation is a part of the State's case in chief and may not, unless the door is opened, be elicited by cross-examination of the defendant's witnesses. Appellant's punishment was not "cruel and unusual." I do not know whether it was "proportioned to the nature of the offense." These matters, and others treated in the majority opinion, I consider relatively unimportant. They are collateral or incidental to the vital question in this appeal which I think has been erroneously decided.

Appellant says that he was deprived of the right to a fair trial. I think he was, but I am not so much concerned with his right as with the failure of the trial court to discharge its duty. In *Miles* v. *State* (1944), 222 Ind. 312, 53 N. E. (2d) 779, the judge re-instructed the jury in the involuntary absence of the defendant. The judgment of conviction was reversed not on the ground that appellant was denied the right to be present but that the court failed in its duty to require

his presence. Is the duty to have an accused in the courtroom throughout the trial more important than the duty to give him a fair trial while he is there?

Neither of these duties is mentioned in the constitutions under which we live. Nor is the presumption of innocence. Nor the requirement of proving guilt beyond a reasonable doubt. Inherent in our jurisprudence are certain fundamentals that need no specific constitutional protection nor mandate. The responsibility resting upon courts to accord a fair trial to a person charged with crime is one of these fundamentals. It is universally recognized as a part of the law of the land. 14 Am. Jur., *Criminal Law*, § 129, p. 853. If it is flagrantly disregarded in a trial court to the detriment of the accused, on this court, when its remedial power is sought, rests the responsibility of correction.

There are numerous definitions of "fair trial." See *State* v. *Gossett* (1921), 117 S. C. 76, 108 S. E. 290, 16 A. L. R. 1299; *Sunderland* v. *United States* (1927), C. C. A. 8th, 19 F. (2d) 202, 216; *People* v. *Wolf* (1906), 95 N. Y. 264, 76 N. E. 592; 14 Am. Jur., *Criminal Law*, § 130, p. 853. But definitions are not important. There surely can be no gainsaying that a trial into which a prosecuting attorney wilfully and persistently injects extraneous prejudicial matter is not a fair trial. The kind of prejudice—religious, racial, political, social—is immaterial. Here the prosecuting attorney was fired with an intolerant, patriotic fervor, communicated to the jurors, calculated to inflame their passions against a defendant whom he regarded and wished them to regard as lending aid and comfort to the axis powers. The accusation was assault and battery, but the trial was for treason.

Let us look at the record. The affidavit was as follows:

"Frank R. Lucas, being duly sworn upon oath, says that on or about the 25th day of October, 1944, at and within the County of Kosciusko and State of Indiana, Charles (Pete) Blue then and there being, did then and there in a rude, insolent and angry manner unlawfully touch, beat and strike the person of Paul Burgess

"Contrary to the form of the Statute in such cases made and provided, and against the peace and dignity of the State of Indiana."

On the day of arraignment appellant waived, but the prosecutor insisted upon, a jury trial. The case was set for trial out of turn because, the entry states, of 11 cases "growing out of the same circumstances," this was the only one requiring a jury. The attorney who appeared for appellant when he was arraigned "not being able to appear in court," another was employed on the day set for trial, securing one day postponement. The trial, lasting two days, was begun December 12, 1944, when, as stated in appellant's brief, "the 'Belgium Bulge' was in its darkest hour." Present counsel, employed after the verdict, prepared the motion for new trial. It contains the usual specifications but also four which are quite unusual. Two of them charge that an instruction prepared and given by the court "accentuated" the errors complained of in the other two. While I think the instruction was erroneous I do not share counsel's view as to its effect. It may have been intended to repair the damage done by improper cross-examination and prejudicial argument, but the language was ill-chosen even for that purpose. Besides, "one party may not be permitted to get the other into a dying condition and then expect the court to revive him by instructions." *Martin* v. *Lilly* (1919), 188 Ind. 139, 121 N. E. 443. The other two unusual specifications I quote in full:

## "III

"Error of law occurring at the trial in that the Prosecuting Attorney, as shown by the record, persistently followed a line of improper and irrelevant questioning of defendant's witnesses on cross-examination and failure of the court to immediately control such conduct to the prejudices of defendant and his defense before the jury, and failure of the court of its own motion to promptly instruct the jury to disregard such line of questioning and all collateral issues injected into the trial of the cause before the jury for the obvious purpose, as shown by the record, of building up within the minds of the jury a violent prejudice which resulted in an unfair trial to the defendant, and resulting in the assessment of an exorbitant, unjust, and unfair penalty against the defendant, in view of the nature of the offense charged as shown by the record, as follows:

"(a) Of the witness Howard Shepler, called on behalf of the defendant, upon cross-examination as shown by the record, the. Prosecuting Attorney asked the following improper and prejudicial questions, injecting into said cause a collateral issue having no bearing upon the offense committed or the credibility of the witness:

"Q. What is your draft status?

"A. 2-B.

"Q. What does that mean?

"A. I am deferred on account of defense work.

"Q. As an essential worker?

"A. That's right.

"Q. You were not an essential worker the day you went over to prevent other people from working on their regular jobs?

"A. You might say it was because we were upholding what we think is right.

"Q. And you wanted to stop war production?

"A. Yes, in a way.

"Q. And you had a good soft job when a lot of the boys were overseas fighting?

"A. If moulding is a soft job.

"Q. Answer the question.

"A. I stated that moulding isn't soft work.

"Q. You were not moulding that day. You were over there retarding production.

"A. No, I was off with a sprained vertebrae in my back. I had not been to work for three or four days.

"Q. You went to the draft board and got yourself deferred because you were an essential worker in a war plant.

"A. I didn't go to the draft board.

"Q. But you took your deferment and was glad to get it.

"A. I can't say I was glad to get it, no.

" (b) And of the witness Helen Smith, called by the defendant, upon cross-examination, as shown by the record, the Prosecuting Attorney was guilty of misconduct in pursuing the following line of questions and answers which were highly prejudicial to the defendant's defense and resulted in an unfair and unreasonable and unjust verdict in the assessment of the penalty, to-wit:

"Q. You know who a man named Eisenhower is?

"A. Who did you say?

"Q. You know who General Eisenhower is, do you?

"A. Yes, I know who he is.

"Q. Well, have you been reading in the paper recently how he has been begging for more ammunition and supplies and materials and things for the armies?

"Objection was made and sustained.

"Q. You knew when you went over there to picket that you were lending your aid to the suppression or retarding of the making of vital war material, retarding war production, didn't you?

"Objection overruled.

"A. Yes.

"Q. You thought that was perfectly all right, did you?

"A. I thought it was all right to help those people that need help.

"Q. It wouldn't make any difference that it meant a soldier's life?

"A. I wanted to help the strikers, but that wouldn't hurt a soldier's life.

"Q. That is what you think?

"A. Yes.

"Q. You think it is perfectly all right to close the factories to help these men who are getting good salaries at the expense of those at the front who need supplies and materials?

"A. I think it is all right to help these people so these boys won't have to fight here the same as over there.

"Q. Your husband isn't in the army, is he?

"A. No.

"Q. Have you any children? ·

"A. We have two.

"Q. Your husband is twenty-six years old?

"A. Yes.

"Q. And a traveling salesman?

"A. Yes.

"Q. Do you know what his classification is?

"A. 4-F.

"Q. And you think it is perfectly all right, even if it is necessary to use force and violence, to prevent workmen from carrying on their usual occupations?

"A. I don't believe in using force, because there isn't any use.

"(c) And of the witness, Orville Taylor, called by the defendant, upon cross-examination, as shown by the record, the Prosecuting Attorney asked the following questions which were highly prejudicial, improper, and injected into the trial a collateral issue which resulted in an unfair and unjust verdict and assessment of penalty, to-wit:

"Q. You didn't care a whoop whether production of war material was retarded or not?

"A. No, sir.

"Q. The fact of the matter was, you wanted the factory closed up?

"A. That's right.

"Q. Your attitude was, you better do what we want or we will close you up?

"A. That is the way I felt or I would not be on the picket line.

"Q. Is that the way you still feel about it?

"A. We are back to work now. The dispute was settled and we went back to work.

"Q. And you think it is perfectly all right to use force and violence to keep a man from going to work?

"A. I didn't see any force and violence out there.

"(d) And of the witness Michael Priser, called by the defendant, as a witness and in his behalf, upon cross-examination, as shown by the record, the Prosecuting Attorney pursued the following highly prejudicial and unfair cross-examination, injecting into the trial of said cause a collateral issue which deprived the defendant of a fair trial as manifest in the excessive penalty assessed in the verdict of the jury:

"Q. You thought it was all right to stop production over at the Arnolt Motor Company?

"A. Yes, sir.

"Q. You knew what they were making, didn't you?

"A. No, sir.

"Q. You knew they were making vital war materials, didn't you?

"A. No, in fact I didn't know what their work consisted of until I read it in the paper.

"Q. It didn't make any difference to you whether their production would stop and retard the manufacture of vital war supplies?

"A. No, sir.

"Q. Even if it had been necessary to use violence and force, it would not have made any difference to you, would it?

"A. No, sir.

"Q. You think it is a case of necessity, a case so necessary that just because there is a dispute between a union and a factory, you endanger the lives of the boys overseas who are bleeding and dying for their country, by stopping production of necessary war material, so that they are left without ammunition and supplies, you think that is higher and more important than their lives, that is your attitude, is it?

"Defendant was entitled to have the charge of assault and battery tried before the jury wholly stripped of collateral and prejudicial matter.

"The Prosecuting Attorney followed the above line of questioning on cross-examination wholly for the purpose of prejudicing the minds of the jury against the defendant and for the purpose of having the jury impose upon the defendant excessive punishment in event they should find defendant guilty.

"It is apparent from the record as above shown that defendant was being tried by the Prosecuting Attorney for his membership in a union and for being in a picket line, and the questions propounded by the Prosecuting Attorney with reference to the collateral issue of the war and need for materials was for the obvious purpose, as shown by the record, of inducing the jury to assess a penalty on the basis of interference with the war effort rather than for an assault and battery, and the nature and extent of punishment assessed and fixed by the jury makes it clearly appear that this conduct on the part of the State was prejudicial to the defendant, in the extreme.

"Defendant, by this line of questioning and conduct of the Prosecuting Attorney was deprived of a fair and impartial trial and denied the right of a fair and impartial verdict in violation of his constitutional rights.

"Even in the absence of objection on the part of defendant's counsel, it was the duty of the court to control such conduct on the part of the Prosecuting Attorney and to prevent it and to thoroughly, and at the time, to instruct the jury not to consider such conduct or questions in fixing the amount

of the punishment in event they should find defendant guilty as charged.

"These collateral issues so introduced had strong emotional and prejudicial appeal to the jury at a time when the nation was engaged in war resulting in excessive punishment of the defendant, and certainty of guilt on account of the source of the trouble being a labor dispute, a strike and a picket line in violation of defendant's constitutional rights.

## "XIV

"Error of law occurring at the trial arising from misconduct of the Prosecuting Attorney in his argument to the jury in which he made highly prejudicial statements to the jury as set out in affidavits in the words and figures following: . . .

"Ladies and Gentlemen of the Jury, do you want a few labor unions, picketeers and hoodlums to shut down our war effort and stop our war production while our boys are over there on the fighting front fighting for all of us? This hoodlum (referring to the defendant Blue) by the acts which have been proved here in evidence is no better than a saboteur, *and should be made to face the firing squad.* This defendant, Pete Blue, his instructed witnesses, and the hoodlums from this picket line are worse than saboteurs. It is true they have things like this in the big cities, but we won't have them in a peaceable county like this. Ladies and Gentlemen of the Jury, give this man the full extent of the law, and we won't have any more occurrences of this kind in our community I guarantee you. Over in Germany such men as this defendant here would be shot by a firing squad—he wouldn't have the honor of going before an honest jury as this man has here. These fellows (referring to labor union men) are worse than German spies sent over here from Naziland. *This fellow, Blue, must have animal blood in him to do what he has done—otherwise he could not account for the things that have occurred.* Men out there on the picket line and the other hoodlums who support Blue have been rehearsed and appear here as instructed witnesses to help this saboteur in his

acts against the Government of the United States. If you jurors think any thing of your soldier and · sailor sons and daughters, give this fellow the limit of the law, and if you don't think of your own sons and daughters, for God's sake think of my son who is over there." (My italics.)

When the motion for new trial was heard the prosecuting attorney admitted that the affidavits setting out this language were "substantially true," except that he denied making the italicized statements. The evidence at this hearing is included in a bill of exceptions.

Shepler was the first of appellant's nine witnesses, only three of whom escaped the kind of cross-examination above set forth. They were all workers and members of the same union but employed at other plants. One testified on cross-examination that she and other witnesses had conferred with the appellant's attorney but that neither he nor any one else had told her how she should testify. This is the only excuse in the record for the prosecutor's accusation that they were "instructed" witnesses. Upon his motion the witnesses were separated. Their stories varied in detail sufficiently, in my opinion, to exclude any reasonable inference that they had been coached.

The majority "are not certain that the criticized cross-examination was improper . . . ." I think it is indefensible. It is elemental that cross-examination should be restricted to the subject-matter of the original examination. *Patton* v. *Hamilton* (1859), 12 Ind. 256. There is not a syllable of evidence elicited in the direct examination of any of the nine witnesses as to the draft status, social philosophy or patriotism of the witness, or any other matter justifying or opening the door to this kind of cross-examination.

Nor did it test the credibility of the witnesses. The

"wide latitude" permitted for this purpose must be confined to the purpose. In what respect did the draft status of Mrs. Smith's husband tend to show whether she was telling the truth on the witness stand? Or her belief that she had a right to assist strikers in a war plant? Or the fact that a soldier's life might be endangered by the strike? These inquiries were not made to that end but clearly were intended to prejudice the jury against all those who took part in the strike, including appellant.

In describing the scene of action and what occurred there was little variation between the testimony of the State's witnesses and the direct testimony of witnesses for appellant. The two extremes are found in the stories told by Carl Sutherlin, the last of appellant's witnesses, and Frank Lucas, the sheriff and prosecuting witness. The former said that Burgess was helped up on the bumpers by Sheriff Lucas, who insisted that he go over the bumpers through the picket line and pushed him two-thirds of the way across when Blue pushed him back; and that he did not fall. Lucas was asked by the prosecuting attorney to state "just exactly what you saw happen there" and replied:

"Pete Blue, *in a rude and angry manner,* stepped from the place where he was standing. He rushed over to where Mr. Burgess was climbing across the car; he was up on the bumpers, and Pete Blue, *in a rude and angry manner,* brought back and struck him with his fist and knocked him over to the inside of the little circle of cars between that and the office, knocked him flat to the ground; he hit him on the chest." (My italics.)

The inclusion in this answer of the italicized phrases warrants the inference that the sheriff had either been advised or had informed himself as to the desirability

of bringing his testimony within the statute and affidavit. See affidavit, *supra*. Even under Sutherlin's version I would have no difficulty in concluding that an assault was committed. But I submit that a jury believing Sutherlin would have been disposed to fix a lesser penalty than one accepting the sheriff's story as the truth.

The only defense of the prosecutor's argument attempted in the majority opinion is based upon the premises that the cross-examination was proper. Even were the premises sound, the conclusion would not follow. I find nothing in the evidence to justify such name-calling as "picketeers," hoodlums, saboteurs or German spies. Characterizing appellant and his witnesses in such terms and vehemently appealing to the jury to give appellant "the limit of the law" because of "his acts against the Government of the United States" are not adequately described by the statement of the majority that he "referred with some bitterness to the strike and its effect upon war production . . ." In this case, from its inception, is evident the desire of the prosecuting attorney to get before the jury, which he demanded, his conviction that appellant and his associates were engaged in a traitorous enterprise for which the extreme punishment permitted by the statute should be assessed. And he succeeded. His views did not inadvertently slip into the evidence. They were, in my opinion, deliberately and wilfully injected and, as before stated, converted a prosecution for assault and battery into a trial for treason.

The duties of attorneys and judge in the conduct of a trial have been defined by eminent jurists whose words I quote:

"But a trial in court is never, as respondents in their brief, argue this one was, 'purely a private

controversy . . . of no importance to the public.' The state, whose interest it is the duty of court and counsel alike to uphold, is concerned that every litigation be fairly and impartially conducted and that verdicts of juries be rendered only on the issues made by the pleadings and the evidence. The public interest requires that the court of its own motion, as is its power and duty, protect suitors in their right to a verdict uninfluenced by the appeals of counsel to passion or prejudice. See *Union P. Ry. Co.* v. *Field,* 137 Fed. 14, 15; *Brown* v. *Sineford,* 44 Wis. 282, 293. Where such paramount considerations are involved, the failure of counsel to particularize an exception will not preclude this Court from correcting the error. *Brasfield* v. *United States,* 272 U. S. 448, 450." Mr. Justice Stone in *New York Central R. R. Co.* v. *Johnson* (1929), 279 U. S. 310, 73 L. Ed. 706, 49 S. Ct. 300.

"A judge, at least in a federal court, is more than a moderator; he is affirmatively charged with securing a fair trial, and he must intervene sua sponte to that end, when necessary. It is not always enough that the other side does not protest; often the protest will only serve to emphasize the evil. Justice does not depend upon legal dialetics so much as upon the atmosphere of the court room, and that in the end depends primarily upon the judge." Judge Learned Hand in *Brown* v. *Walter* (1933), C. C. A. 2d, 62 F. (2d) 798.

"An attorney at law, as an officer of the court, speaks in a certain sense by its authority. He speaks in its presence, and when he addresses a jury it is its duty, although not specially requested, to interpose, if he urge upon them considerations obviously foreign to the cause and appealing to prejudice instead of reason. It is true that the counsel for the adverse party ought ordinarily in such a case, if the court remains silent, to call its attention at once to the objectionable features of the argument; but there are occasions when this might simply give rise to a succession of unseemly wrangles at the bar, and others in which what has been said has, as soon as uttered, done its work beyond all power of remedy. In such exceptional cases, and this was of that

description, a verdict in favor of the party whose counsel was in fault should be set aside, notwithstanding a failue of the other party to take exception to the remarks at the time when they were uttered. *State* v. *Laudano,* 74 Conn. 638." Judge Baldwin in *Hennessy* v. *Metropolitan Life Ins. Co.* (1902), 74 Conn. 699, 710, 52 A. 490, 494.

"It is complained that in the argument to the jury statements were made by counsel for plaintiffs inflammatory in their character and not based upon the evidence. It is answered that counsel for defendant also was at fault. Courts fail in their function when their judgments are not in accord with the merits of the controversy. Trial judges cannot preserve the dignity and gravity of the court without the aid of the bar. The lawyer owes it to the litigant, as well as to the state, to prevent a diversion of the juror's mind from the question he has sworn to try. As we have heretofore said, when misconduct of counsel is such that no admonition or rebuke can entirely destroy its sinister influence, a new trial will be awarded, regardless of want of objection and exception." Judge Cornish in *Starr* v. *Chicago, B. & O. R. Co.* (1919), 103 Neb. 645, 173 N. W. 682.

The above quotations are from civil cases where the attorneys for the plaintiff and the defendant were on a par. There is a difference in criminal cases as declared in the classic statement of Mr. Justice Sutherland:

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain

from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger* v. *United States* (1935), 295 U. S. 78, 79 L. Ed. 1314, 55 S. Ct. 629, quoted in *Swanson* v. *State* (1944), 222 Ind. 217, 52 N. E. (2d) 616.

Similar views are found in the following quotations:

"Prosecutors should be zealous in their efforts to enforce the criminal laws, but this does not mean that they are either required or authorized to override the Constitution and thus become lawbreakers themselves in order to secure convictions." *State* v. *Wellman* (1913), 253 Mo. 302, 161 S. W. 795.

"Above and beyond all technical procedural rules, designed to preserve the rights of litigants, is the public interest in the maintenance of the nation's courts as fair and impartial forums where neither bias nor prejudice rules, and appeals to passion find no place, though the government itself be there a litigant." *Pierce* v. *United States* (1936), C. C. A. 6th, 86 F. (2d) 949.

See also *Latham* v. *United States* (1915), C. C. A. 5th, 226 F. 420, 425; *People* v. *Lieska* (1910), 161 Mich. 630, 638, 126 N. W. 636, 639; *State* v. *Horr* (1923), 63 Utah 22, 46, 221 P. 867, 877; *Turner* v. *United States* (1929), C. C. A. 8th, 35 F. (2d) 25. Judged by these standards there surely can be no question that in this case the prosecuting attorney clearly violated his duty not merely to the appellant but to the sovereign state. By these standards also the trial judge contributed to the prejudicial conduct of the trial. Silence when it was his duty to control counsel and maintain the judicial atmosphere of the court may well have been taken by the jury as acquiescence in the views expressed by the prosecuting attorney. His refusal to set aside the verdict is consistent with this attitude. As stated in *Martin* v. *State* (1886), 63 Miss. 505, 56 Am. Rep. 812,

"It is the duty of the presiding judge . . . to interfere of his own motion to prevent a breach of privilege of counsel, and if he fails to do so and the abuse of privilege is of such character as to produce the conviction that injustice resulted therefrom, the duty of this court is to apply the corrective by awarding a new trial."

See also *Sylvester* v. *State* (1933), 205 Ind. 628, 630, 187 N. E. 669, 670. The attorney for appellant, conceded to be competent, likewise failed in his duty as an officer of the court. But his culpability does not excuse nor minimize the fault of its other officers.

The real stumbling block to the majority is found in their statement "that with a single exception (*Wilson* v. *State*), no Indiana case cited was reversed for misconduct or failure of court or counsel when objection was not made at the trial." There is more similarity between that exceptional case and this one than the majority have seen. Neither Wilson nor Blue received a fair and impartial trial. All three of the principal officers of the court contributed to the result. Wilson's attorney was incompetent and Blue's not, but in each case, his attorney not objecting, the defendant was prejudiced by the conduct of the other two officers. In the Wilson case the judge spoke when he should have been silent; here he was silent when he should have spoken. Wilson's prosecutor was outdone by Blue's. The prejudice he injected went to the issue of punishment instead of guilt. But in both cases there was prejudice that deprived the defendant of a fair trial. In the former it was noted that the guaranty in Art. VI of competent counsel in federal courts is also protected by the Fourteenth Amendment. *Powell* v. *Alabama* (1932), 287 U. S. 45, 77 L. Ed. 158, 53 S. Ct. 55, 84 A. L. R. 527. The similar guaranty applying to state courts in Art. I,

§ 13 of the Indiana Constitution has the same protection. This court about three months ago said in *Attkisson* v. *Usrey* (1946), ante. p. 155, 65 N. E. (2d) 489:

> "The trial must be a fair one before an impartial tribunal. Any procedure which fails to extend fundamental and established right fails of due process. 16 C. J. S. Constitutional Law, § 569, p. 1153."

This squares with a similar statement in *Wilson* v. *State, supra*:

> "But in a case involving an appellant's life or liberty we may not ignore prejudicial errors affecting his constitutional rights when, as here, they are clearly and adequately presented in appellant's brief with supporting bill of exceptions. The procedural rules that would prevent their consideration must give way to the fundamental principles of due process."

Whether the argument be based upon a defendant's right or upon the court's duty, due process requires a fair and impartial trial. Lack of procedure, or slavish adherence to procedure that interferes with this fundamental substantive right and requirement, in my opinion, violates the Fourteenth Amendment.

Cases like this are unusual but not unprecedented. Other appellate courts have not hesitated to grant new trials for such misconduct in the trial court. Judgments so reversed in civil cases include *Brown* v. *Walter, supra; Hennessey* v. *Metropolitan Life Ins. Co., supra; Houston & T. C. R. Co.* v. *Rehm* (1904), 36 Tex. Civ. App. 553, 82 S. W. 526; *Starr* v. *Chicago, B. & O. R. Co., supra.* See also *Prather* v. *McClelland* (1894), 76 Tex. 574, 13 S. W. 543, 26 S. W. 657; *Aetna Life Ins. Co.* v. *Kelley* (1934), C. C. A. 8th, 70 F. (2d) 589, 93 A. L. R. 471; *Dorsey* v. *Proctor* (1925), 207 Ky. 385, 269 S. W. 316; 1 **C. J. S.**, *Appeal & Error,*

§ 297, p. 591, n. 32. In *New York Central R. R. Co.* v. *Johnson, supra,* there seems to have been some effort at restraint but it was not effective. Criminal cases include *People* v. *Simon* (1927), 80 Cal. App. 675, 252 P. 758, reversed for injection of racial prejudice by a prosecutor's argument to which no objection was made until the case was in the appellate court; *State* v. *Wellman, supra,* wherein the prosecuting attorney, without protest, called a witness a prostitute, her reputation not being in issue; *Martin* v. *State, supra,* for argument considerably less violent than in the case at bar. See also note in 78 A. L. R. 1438, 1528.

In *Davis* v. *State* (1941), 218 Ind. 506, 34 N. E. (2d) 23, a judgment was reversed for error in overruling a motion to quash the affidavit. The court, aware that anything else would be *obiter dictum,* deemed it advisable to comment on the closing argument to the jury made over objection and motion to withdraw submission. I quote the language of Judge Fansler:

> "The remarks of the prosecuting attorney here in question were entirely outside the record, and seem to have been made for the purpose of inflaming the minds of the jurors against the defendant, a stranger in the community. At the time of the trial (November, 1940) there was much agitation and suspicion of sabotage by persons charged or suspected of being Communists. There was evidence of excitement over these matters among patriotic citizens. Under such circumstances grave doubts arise as to whether a fair trial has been given a stranger charged by the legal representatives of the state with being a Communist who disrespects the flag. Prosecuting officers, sworn to support the Constitution, and patriotic citizens, should be the first to insist upon protection of the constitutional right to a fair trial, and they should carefully avoid improprieties tending to prejudice that right, lest they be charged with sabotage of constitutional rights."

When Blue was tried the war news was alarming. The last German thrust seemed to have broken through our lines in Belgium with unprecedented casualties among our troops. There were reports of lack of munitions. Strikes in war plants were thought by many persons to be unpatriotic. This strike, which lasted several days, occurred in such a factory a few miles from the Court-house in Warsaw. The trial could not have been conduct-ed without frequent references to the picket line, auto-mobiles parked bumper to bumper, the desire of some employes to work and their restraint by the pickets and barricade. Resentment in the community was evidently "running high." If ever there was a time, more than an-other, when judicial officers should have been zealous in maintaining a judicial atmosphere it was when a jury trial was held in such a setting.

There is a striking parallel between this situation and the one described in *August* v. *United States* (1918), C. C. A. 8th, 257 F. 388. This also was a trial in war-time. August was accused of offering a bribe to a mem-ber of a draft board to escape military service. With-out objection he was berated by the prosecuting attorney in his opening statement as Blue and his associates were villified in the closing argument. In reversing the judg-ment of the conviction the court said:

"The case was tried on March 5, 6, 7, and 8, 1918. On these dates it was not necessary to inflame the passions of jurors by talking about the enemies of our country, rather was it a time to caution jurors against allowing their prejudices and patriotism from swaying their judgment. But the Assistant United States Attorney so far transcended his duty as a prosecuting officer that we are clearly of the opinion that the conviction of the defendant ought not to stand. The language used speaks for itself. It must have produced a situation in the minds of the jurors that destroyed a calm consideration of

the rights of the defendant. The United States cannot afford to convict her citizens in this manner."

Nor can Indiana.

If ever the credibility of appellant's witnesses was the concern of the prosecuting attorney, it ceased to be when he reached his peroration. They were traitors. Foes of the United States. They had endangered the lives of patriots sons and daughters of America and his own son who was "over there." The issue was no longer: Is appellant guilty of assault and battery and, if so, how severely shall he be punished? Far from it. He was trying appellant, his witnesses and the union to which they belong for conspiring "to shut down our war effort and stop our war production." For this he asked the jury to give "this fellow the limit of the law." It did. No one can say his argument was not responsible for the verdict.

The war is over. It should be possible now to try appellant "in an atmosphere of judicial calm." *State* v. *Gossett, supra.* He is not likely to escape conviction and punishment, perhaps as great as that meted out by the former jury. But it should come at the end of a fair and impartial trial. This is his right. But above his right I place the trial court's duty to give him a fair trial. For its failure to perform that duty this court should reverse the judgment and order a new trial. *Martin* v. *State, supra.*

NOTE.—Reported in 67 N. E. (2d) 377.