## RARIDEN v. STATE OF INDIANA.

[No. 29,929. Filed November 6, 1961. Rehearing denied April 17, 1962.]

*State* (1958), 239 Ind. 103, 153 N. E. 2d 899, (Cert. denied, 366 U. S. 914, 6 L. Ed. 2d 238, 81 S. Ct. 1089); *Yarber* v. *State* (1962), 242 Ind. 616, 179 N. E. 2d 882.

690

*Frank A. Symmes* and *Charles W. Symmes,* both of Indianapolis, for appellant.

*Edwin K. Steers,* Attorney General, *Richard M. Givan,* Assistant Attorney General and *Richard C. Johnson,* Deputy Attorney General, for appellee.

JACKSON, J.—This is an appeal from a conviction of first degree murder and a sentence of life imprisonment rendered by the Jackson Circuit Court on September 28, 1959, following the return of the jury's verdict on September 23, 1959.

Appellant was indicted by the grand jury of Lawrence County, Indiana, on November 6, 1958, for murder in the first degree of one Bert Butler. By change of venue filed by appellant the cause was sent to Jackson County, Indiana, and cause submitted to trial by jury starting September 14, 1959. After his conviction and sentence, appellant filed a written motion for a new trial on October 21, 1959, which motion was overruled on January 5, 1960, and an appeal was duly perfected in this court on March 30, 1960.

The indictment, based on Acts 1941, ch. 148, §1, p. 447, being §10-3401, Burns' 1956 Replacement, in pertinent part reads as follows:

"The Grand Jurors of Lawrence County, in the State of Indiana, . . . on their oath present that one George Rariden late of said County, on the 20th day of October, A.D. 1958, at said County and State aforesaid, did then and there unlawfully, feloniously and purposely, and with premeditated malice, kill and murder one Bert Butler, a human being, by then and there unlawfully, feloniously, purposely and with premeditated malice, shooting at, against and into the said Bert Butler, with a certain deadly weapon, called a pistol, then and there loaded with gunpowder and bullets, and thereby inflicted a mortal wound upon the said Bert Butler, of which mortal wound the said Bert Butler then and there died. And so the Grand Jurors aforesaid, upon their oaths aforesaid, do say and charge that the said George Rariden did unlawfully, feloniously, purposely, and with premeditated malice, kill and murder the said Bert Butler, in manner and form aforesaid, . . ."

To the indictment the appellant filed a motion to quash, which in pertinent part reads as follows:

"1. The facts stated in said indictment do not constitute a public offense.

"2. Said indictment does not state the offense with sufficient certainty."

Appellant's motion to quash was overruled on November 20, 1958.

After the trial and conviction appellant filed his motion for a new trial; such motion for a new trial contained thirty-four specifications and of necessity will have to be dealt with here very briefly.

"1. The Court erred in overruling defendant's Motion to Quash the Indictment.

"2. That the verdict is not sustained by sufficient evidence.

"3. That the verdict is contrary to law.

"4. That the Court erred in refusing to give each of defendant's final tendered instructions numbered 1, 2, 4, 6, 8, 9, 11, 12, 15, and 18."

. . . . .

"18. The Court erred in giving to the jury each of its final instructions Nos. 1-28, inclusive. . . . ."

The remaining specifications 20 through 34, related to the ruling of the court in sustaining objections to the questions asked by the defendant on cross-examination of State's witnesses, and the overruling of defendant's objections to questions asked the State's witnesses on cross-examination. Such of these specifications as we deem necessary for a determination of the issues in this cause will be discussed hereafter.

The appellant appeared as a witness in his own behalf and testified to the events leading up to the killing. In substance the testimony of the appellant was to the effect that on the afternoon of October 20, 1958, someone fired several shots on his farm which stampeded his cattle. That he, at that time, was preparing to go to the bank at Bedford and to visit his mother; that he had on his person a check payable to his wife in the sum of approximately $10,000 which had been indorsed and which he intended to deposit in the bank. That among other things he had placed a pistol in his car preparatory to going into town. That when he heard the shots he went out to the woods to see who was there and on arriving at the woods saw an individual whom he identified as the deceased, yelled at him, and that that person fired several shots into the limbs over his head and then ran off. Appellant returned to his home, got into his car and drove to the home of the decedent, finding that the decedent was not at home, waited in his car until the decedent appeared walking towards his house carrying a rifle. The appellant and decedent got into an altercation over the events occurring on appellant's farm. The decedent was standing by the side of the car and appellant claims that decedent first struck him on the arm with the butt of the rifle, then attempted to reverse the same, at which time appellant grabbed the rifle, decedent stood back and appellant thought that he was preparing to shoot him. Appellant then fired one shot with the revolver, striking decedent and causing him to fall to the ground. Appellant further testifies that he went to the home of a neighbor, immediately after the shooting and before leaving the premises in his car, told the neighbor that he had better call the doctor and the decedent's wife as he

had been compelled to shoot him. On being asked as to how badly injured the decedent was, appellant stated that he thought he was not very badly hurt, but that someone should do something for him. Appellant then drove back to his home, got his wife, and they drove to the home of appellant's mother in the town of Bedford where appellant was later arrested.

The State's evidence was to the effect that about 5:40 P. M. on the afternoon of October 20, 1958, Zelbert Hawkins, then Sheriff of Lawrence County, was called to the home of Bert Butler located some four or five miles from Bedford near the town of Eureka on State Road No. 158. The Sheriff and the Coroner, one Dr. Wynn, proceeded to the Butler home. On arrival they found Butler lying face down on the lawn in front of his house, about two or three feet from the road. Dr. Wynn examined the body and declared that Butler was dead. Pathological examination showed that death was caused by a bullet which entered the left side of deceased's body and passed through his heart. The bullet removed from the body of decedent was identified as a 32 caliber full jacketed bullet. Next to the body of the deceased was a 22 caliber rifle.

Bert Butler's widow testified that he returned from work a few minutes past 3:00 o'clock on the afternoon of the 20th, and that he left the house about 15 minutes later taking with him his 22 caliber rifle. The next time she saw her husband he was lying dead on the front lawn near the road.

James Quackenbush testifying for the State stated that he lived five miles west of Bedford on the Tripleton Road; that appellant came to his home at about 5:20 P. M. on October 20, 1958, and stated that it had

been necessary for him to run Butler off of his farm that afternoon, but that he did not catch him. Appellant then got into his car and drove to Butler's home where he awaited his arrival. That when Butler returned and he remonstrated with him about hunting on his farm, Butler hit him on the arm with the butt of his gun he was carrying. The witness then testified that appellant told him that Butler turned around to shoot and that appellant grabbed the gun which went off, and that at this point appellant shot Butler with the revolver.

Lula Quackenbush, wife of the witness, James Quackenbush, testified substantially to the same facts as her husband.

Grady Kee also testifying for the State, testified that he was the deceased's next door neighbor, that he saw Butler standing near the road in front of Butler's house, that Butler was at the top of the slope in the yard at the time, and there was a car parked just off the road adjacent to where Butler was standing. He then walked to the back of his house, then returned to where he could see Butler and the car, then again went to the back of the house where he heard a blast. The witness was engaged in changing his clothes and only investigated after talking to his wife. On going to Butler's yard he found his body, and while bending down to feel if Butler had any pulse, discovered the 22 rifle. He testified that he picked up the rifle, examined it, and then placed it beside Butler's feet.

Margie Kee, wife of Grady Kee, also testified for the State, her testimony being that while sitting in her front room she heard two voices and a blast. She states that one of the voices was loud and angry and that she had not previously heard this voice. Shortly

after the blast, while watching out her picture window, she remembered seeing a car pass by the front of her house. She could not describe the car other than noticing that it was not black. She testified that she had a phone call from James Quackenbush four or five minutes after hearing the blast, and that she investigated and saw Butler's body lying on his property in front of his home.

James Canada testified for the State that he saw appellant sitting in his two tone green car by Mr. Ikerd's farm between 5:15 and 5:30 P. M. on the evening of October 20th. He further stated that he saw Butler nearing his property at that time and that Butler was carrying a rifle.

Several other witnesses including Mildred Knight, Genieve Quackenbush and Winifred Quackenbush stated that they had seen the deceased that afternoon and that at that time he was carrying a gun.

Edward East, a boy 14 years of age, at the time of the trial, testified that on the evening of the 20th of October, 1958, he saw Bert Butler crossing the driveway to the East home going towards Butler's yard, that at that time a car pulled up in front of the Butler premises and stopped next to Butler who then engaged in a conversation with the driver. The following account was given of that conversation:

"Well, the guy in the car, he was the first to speak and he said 'it's about time you got home, I've been waiting on you' and Bert he asked what he wanted and the guy in the car says 'you've been hunting on my land again' and Bert said 'that ain't so'—then the guy in the car said— Bert said—'I haven't been recently' and the guy in the car says 'just come from chasing a man and dog off his porperty [property] that looke [looked] like him' and Bert said 'that's not so' and

the guy in the car said 'you've just been hunting ain't you' and Bert said—the guy in the car said 'you've just been hunting, ain't you, where have you been?' and Bert says 'that ain't noe [none] of your business, now get on down the road, I tell you' and then the shot was fired after that."

This witness stated that he was about 75 feet from the person who was talking and that he could hear, but could not see the person clearly because his vision was obscured by bushes. The prosecutor then asked:

"Question 38. Now did you hear another shot besides this one you already testified to?

"Answer Just one shot."

In view of some of the objections interposed to the curtailment of the witness, Edward East, on cross-examination, we think it pertinent to include here a part of the cross-examination as follows:

"Question 11. Well, with reference to time of working on the school work?

"Answer Yes, I left the kitchen, but I don't know what time.

"Question 12. And where did you go?

"Answer To the barn.

"Question 13. How?

"Answer To the barn.

"Question 14. To the barn, and where is that with reference to your property?

"Answer It's a little ways in back of the house.

"Question 15. And how long did you remain there?

"Answer Just long enough to fasten the door and come back.

"Question 16. Did you go in the house?

"Answer No.

"Question 17. Now did anyone talk to you that night with reference to what had occurred, any officers?

"Answer No.

"Question 18. Did they talk to anyone in the family to your knowledge?

"Answer No, not that I know of.

"Question 19. Where [were] you ever present when they talked to your mother?

"Mr. Skinner: Now Your Honor, I think the counsel should at least let us know what he is getting at there, otherwise, it would not be relevant, would not be proper cross examination.

"Judge: I'm going to sustain it as not proper cross examination; whether he was present when any officers talked to his mother.

"Question 20. When was the first time that you talked to anybody about what you've claimed to have seen?

"Answer I talked to my parents that night about it.

"Question 21. You talked to your parents. Mildred East one of them?

"Answer Yes.

"Question 22. Is your father living?

"Answer Yes.

"Question 23. Did you testify before the Grand Jury?

"Mr. Skinner: Now I don't think that is proper cross examination either, Your Honor.

"Judge: I'll sustain the objection.

"Question 24. Did you ever talk to Mr. Skinner about this?

"Mr. Skinner: I'll object to that for the same reason.

"Judge: No, I'll permit him to answer if he knows who Mr. Skinner is.

"Question 25. The Prosecuting Attorney who questioned you?

"Mr. Skinner: That's me, Eddy.

"Answer Yes, sir, I know him.

"Judge: Now the question is have you ever talked to him about your evidence.

"Answer Wednesday night was the first time.

"Question 26. Wednesday night of—I didn't hear all of that.

"Judge: Wednesday night was the first time.

"Question 27. Wednesday night of this week?

"Answer Yes.

"Question 28. That's the first time you ever talked to him about it?

"Mr. Laupus: Object to that as repetition, Your Honor, he has already answered that.

"Judge: I will sustain it as repetitious.

"Question 29. Now you say you couldn't see this car or these parties, did you dor [or] did you not?

"Answer I could see the outline of the car.

"Question 30. Could you see the people?

"Answer No.

"Question 31. What prevented you from seeing?

"Answer Bushes.

"Question 32. What attracted your attention with the car stopping?

"Mr. Skinner: Well, now Your Honor, I'll object to that question, the question isn't clear what at-

tracted your attention to the car stopping; that is an act, naturally that is the thing that attracted his attention; now for an adult they might be able to figure that out, but now we have a young boy on the witness stand, I think he should be a little more explicit with his question.

"Judge: I'll sustain it as to the phrasing.

"Question 33. Now Edward you had been to the barn, were you going back to the house?

"Answer Yes.

"Question 34. To the kitchen?

"Answer Yes.

"Question 35. And that's at the back part of the house?

"Answer Yes.

"Question 36. And where were you when this car stopped as you say? When it first stopped there?

"Answer You mean where I was when I heard the conversation.

"Question 37. Where was that with reference to the house?

"Answer We have a basketball goal there, its about seventy-five feet from the road, that's where I was.

"Question 38. Now you did hear a conversation you say?

"Answer Yes.

"Question 39. And do you know who engaged in the conversation?

"Answer Bert Butler was the only one.

"Question 40. He was one of them?

"Answer He's the only one that I know of.

"Question 41. Did you see him at any time in that conversation or while in that conversation?

"Answer Not that I know of.

"Question 42. Are you able to say to the jury at this time, what, if anything, Bert Butler did, not what he said, but what he did, any actions after the car stopped?

"Answer Would you repeat the question.

"Question 43. Did you see Mr. Butler while the car was stopped there?

"Answer I seen glances of him.

"Question 44. How?

"Answer I seen a glimse [glimpse] of him every once in a while, but not entirely.

"Question 45. Do you know, are you able to state to the jury what if anything he was doing?

"Answer No.

"Question 46. While this conversation which you say took place was going on, were you standing still?

"Answer Yes.

"Question 47. How long would you say the conversation lasted?

"Answer I couldn't say.

"Question 48. You couldn't say. I believe you stated that Mr. Butler was still talking when you heard a shot, is that right? Did you not just say that a minute ago in answer to Mr. Skinners question?

"Mr. Laupus: Do you understand the question.

"Answer I don't think so.

"Question 49. Edward did you just tell Mr. Skinner who asked you questions to start with, that Mr. Butler was still talking when you heard the shot?

"Answer The shot was fired immediately after Bert was finished talking.

"Question 50. Do you know Edward what time of day this was?

"Answer From five to six—from five till six—five o'clock to six o'clock anytime in there.

"Question 51. From five to six o'clock sometime in between?

"Answer (witness nods head yes)

"Mr. Branaman: That's all.

"Mr. Skinner: That's all.

"Judge: You may step down."

If any testimony, as depicted by the record, displays the quality of being singularly damaging to the appellant's cause, it is the testimony of this witness, Edward East. He came closest to being an eye witness to the shooting of anyone who testified. At the time of trial, the boy was 14 years of age. The shooting and death of Butler occurred on October 20, 1958, the trial took place in September, 1959. It appears from the record that the first time Edward East apprised any of the authorities of his knowledge of the homicide was during the trial of the cause. He was a young teenager, who for some reason remained silent for almost a year on an event which probably caused great excitement in his community. The imagination of a mature person is often stimulated by unusual happenings of great magnitude, so it is reasonable to speculate on the increased likelihood that the mind of a 14 year old boy would be susceptible to stimulation by a homicide in his community.

The issue raised by the alleged curtailment of the cross-examination of this witness then is whether the trial court improperly curtailed the examination of the witness. Cross-examination is an absolute right, a denial of this right is reversible error.

*Bryant* v. *State* (1954), 233 Ind. 274, 278, 118 N. E. 2d 894; *Marjason* v. *State* (1948), 225 Ind. 652, 653, 75 N. E. 2d 904. The scope of the cross-examination of a witness is well stated in *Blue* v. *State* (1946), 224 Ind. 394, 403, 67 N. E. 2d 377, cert. denied, (1947), 330 U. S. 840.

> "We further suggest that the trial court in its discretion has wide latitude in permitting cross-examination to test the credibility of a witness by disclosing his general attitude toward the circumstances of the case, his interest, his motives, his prejudices, character and other influences which operate upon the mind, and only clear abuse of such discretion demands reversal. *Lincoln* v. *State* (1921), 191 Ind. 426, 133 N. E. 351; *Denny* v. *State* (1921), 190 Ind. 176, 129 N. E. 308; . . .; *Perfect* v. *State* (1925), 197 Ind. 401, 141 N. E. 52."

One question in this regard is whether or not question nineteen was proper examination. The witness had previously answered the two preceding questions in the negative, and where it does not appear that the situation would be changed by the elicited testimony, nor the attitude of the jury be affected by the answer sought, it is in the sound discretion of the trial court as to what extent the cross-examination will be allowed. *Kelley* v. *State* (1948), 226 Ind. 148, 153, 78 N. E. 2d 547; *Ray* v. *State* (1950), 228 Ind. 706, 709, 95 N. E. 2d 212, cert. denied, (1951), 340 U. S. 938.

Appellant complains that reversible error occurred upon the refusal of his tendered instruction No. 12. The instruction concerned the reconciliation of the testimony in favor of the theory of appellant's presumed innocence. There are two other instructions on the presumption of innocence

and one on reconciliation of conflicting testimony. Appellant cites *Scheerer* v. *State* (1925), 197 Ind. 155, 149 N. E. 892, on the proposition that the jury should in the same instruction be apprised of the need to reconcile the testimony, if possible, in favor of the defendant's innocence. In that case the instructions singled out the defendant's testimony for special scrutiny, thus being clearly erroneous. At page 160 the court states "[w]hen a defendant testifies in a criminal case in his own behalf, his testimony must be considered as the testimony of any other witness and weighed in the same manner, . . ." There is no contention in the case at bar that the court instructed otherwise. Appellant further alleges that there was no instruction on the situation where the lack of evidence could be considered. The Court's instruction No. 14 covers this point. The instructions are to be considered as a whole, and if the law pertinent to the evidence is covered by other instructions, the refusal of one certain instruction is not error. *Peltz* v. *State* (1953), 232 Ind. 518, 520, 112 N. E. 2d 853; *Bange* v. *State* (1958), 237 Ind. 422, 434, 146 N. E. 2d 811; *Lenovich* v. *State* (1958), 238 Ind. 359, 364, 150 N. E. 2d 884.

Were this case being tried in a court of first impression, where we had an opportunity to observe the witnesses and weigh their testimony, we might arrive at a different result than that obtained in the case at bar, but on appeal we are bound by the rule that if there be sufficient evidence to sustain the judgment of the trial court, and the record fails to disclose any reversible error, we resolve all questions in favor of the validity of the decision of the trial court.

Judgment affirmed.

Bobbitt, J., concurs.

Landis, C. J., and Achor, J., concur in result.

Arterburn, J., dissents.

NOTE.—Reported in 177 N. E. 2d 736.